Argued November 13, 1936; reversed March 23; rehearing
denied May 11, 1937

# KELLY *v.* GALLOWAY ET AL.

(66 P. (2d) 272, 68 P. (2d) 474)

*Carl E. Davidson*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for appellants.

*E. R. Bryson*, of Eugene (Harris & Bryson, of Eugene, on the brief, for respondent.

ROSSMAN, J. In 1931 the plaintiff received from the Oregon Land and Livestock Company, of which he was a stockholder, the sum of $15,025. This was part of a larger sum and the total came in the form of a

dividend. He did not include in his return under the Intangibles Income Tax Act (1931 Session Laws, p. 572, c. 335) to the State Tax Commission the aforementioned sum of $15,025. The commission was aware of all of the circumstances, and the omission was not prompted by a dishonest purpose. Later, the commission assessed a tax upon this sum and the issue presented by this appeal is whether it was warranted in so doing.

Briefly stated, the facts as admitted by the demurrer to the complaint are: The plaintiff is now and for 30 years has been the owner of some shares of the capital stock of the Oregon Land and Livestock Company. In 1902 this corporation acquired large tracts of timberlands, and since that time has acquired small intermingling tracts. Apart from the purchase of these properties the corporation's sole activities have consisted of maintaining its existence, paying its taxes, protecting its lands, selling portions thereof as opportunities presented themselves, and distributing the proceeds to its stockholders. Prior to December 31, 1929, by common consent of all its stockholders and directors, it was agreed that the corporation "should engage in no business except such as was incidental to the protection of its properties and the sale and disposal thereof, and that as said properties were sold the proceeds thereof should be distributed among its members, and that whenever said assets should be completely disposed of said corporation should be dissolved." October 1, 1931, the corporation sold 4,838.67 acres of its land to the Pelican Bay Lumber Company for $355,047, $71,047 of which was paid at the execution of the contract and the balance was rendered payable in 12 equal annual installments with 6 per cent interest upon unpaid balances. January 8, 1929, it sold 37,538.75 acres of its land to the Ewauna Box Company

for $2,133,158.96 of which $426,600 was paid at the execution of the contract and the balance was rendered payable in quarter annual installments of $50,000 with 6 per cent interest on unpaid sums. We now quote from the complaint: "In the year 1918 the major portion of the holdings of said corporation as then existing was sold * * * in the years 1928 and 1929 said corporation sold over 90 per cent of its remaining lands * * * said corporation had prior to January 1, 1930, sold and disposed of over 98 per cent of its holdings and to the extent that the proceeds of said sale had been received, had distributed the same among its stockholders."

In 1931 the corporation received $114,495.29 principal money and $15,180 interest money from its contract purchasers. In the same year it distributed in dividends to its stockholders all principal and interest money received since December 31, 1929, which had not theretofore been distributed. In this manner there was paid to the plaintiff in 1931 the aforementioned sum of $15,025, representing his part of the principal money received by the corporation. He reported to the defendants his share of the interest money, but not the $15,025.

The corporation's land increased greatly in value and it received from its vendees prices in excess of the cost of the property sold. The following is quoted from the complaint: "In making its return of income to the State of Oregon for the calendar year 1930 said corporation, on account of the aforesaid sales of said timberlands for sums largely in excess of the book value thereof, added to its then book surplus the profits upon said sales above the book value thereof and stated that it had a surplus of $1,792,477.57. * * *" Other facts averred in the complaint will be mentioned later.

From the Intangibles Income Tax Act of 1931, we quote:

"Section 2. * * * 9. The word 'intangibles' means and includes * * * all shares of stock in corporations, joint stock companies or associations.

"Section 3. A tax hereby is imposed upon every resident individual and corporation, which tax shall be levied, collected and paid annually at the rate of 8 per cent with respect to the taxpayer's net income as herein defined. * * *

"Section 7. The term 'net income' means the gross income of the taxpayer from intangibles less the deductions allowed by this act.

"Section 8. 1. The term 'gross income' includes all interest and dividends derived from intangibles as defined in section 2 of this act."

The principal contentions which the plaintiff advances are: Our Intangibles Income Tax statute is a tax upon income, and not one upon dividends, interest, etc. A surplus accumulated by a corporation prior to the enactment of the statute ought to be deemed capital and, therefore, a disbursement out of it ought to be deemed a nontaxable distribution of capital and not an ordinary course dividend. If the tax is construed otherwise its subject is not expressed in its title which states that the purpose of the act is to collect taxes "on incomes received from intangibles as herein defined". After directing attention to the averments of the complaint which state that the commission created by the 1923 income tax statute (1923 Session Laws, p. 410, c. 279) promulgated rules which declared that a dividend paid out of surplus existing at the time when the act went into effect was not taxable, he contends that when the legislature enacted the present statute in language similar to those rules, it intended that a similar interpretation be placed upon it. He contends that at one

time the present commission construed the present act in manner similar to the 1923 commission, and that this purported interpretation is evidence of the meaning of the act. He argues that since the commission deems interest earned prior to the enactment of the statute, but paid subsequently, is not taxable, a holding that a dividend declared out of a previously existing surplus would violate Article I, § 32, Oregon Constitution, which provides that "all taxation shall be uniform on the same class of subjects," the provision of Article IX, § 1, which provides that taxation shall be levied under "uniform rules," and the equal protection clause of the 14th amendment to the federal constitution. Finally, he contends that only dividends declared in ordinary course by going corporations are taxable, and that the dividend which the plaintiff received in 1931 was a liquidating dividend.

■■ Undoubtedly income and intangibles taxes are predicated upon a belief that taxes should be taken "from each according to his capacity". As expressed in the preamble to the statute under consideration, the intangibles tax is intended to exact from those who possess ability to carry a part of the tax burden a just contribution thereto. It accepts income and its components (dividends and interest) as proof of tax-paying capacity. It is difficult to determine exactly how much of a tax should be exacted "from each according to his capacity" because some possess an income of a permanent nature while others, who, like the plaintiff, have invested their funds in a single speculation, have a source of income only so long as the profits from the venture keep on coming in. It is not our duty, however, to undertake to revise the statute so as to render it just, if we believe that it is otherwise, but to give effect to the legislative will by placing upon the terms "in-

come" and "dividends", the latter of which plaintiff believes is ambiguous, the meaning which the legislature intended so far as that meaning can be discovered. The law of taxation accepts from the law of corporations the distinction between the corporation and its stockholders. It regards them as separate persons. It will be observed that the intangibles income tax is not imposed upon the corporation which declares the dividend, but upon the stockholders who receive it. The tax is not levied upon any surplus which the stockholder or corporation owns, but is measured by the individual's income from his intangibles. The stockholder does not own the corporation's surplus. His rights therein are confined to the dividend, if any, paid out of it, and to the right to demand that a dividend be declared when it can be proved that such is the duty of the directors: *Baillie v. Columbia Gold Mining Co.*, 86 Or. 1 (166 P. 965, 167 P. 1167). With these general observations in mind, let us turn to the authorities cited by the parties.

Since the tax imposed by the intangibles tax statute is not imposed upon the corporation, *Doyle v. Mitchell Bros. Co.*, 247 U. S. 179 (62 L. Ed. 1054, 38 S. Ct. 467), and other similar decisions cited by the plaintiff, which construe the federal 1909 Corporation Excise Tax statute, are of but little assistance. The case just cited was an action by a corporation to recover from the collector additional taxes assessed under the statute just mentioned. The corporation was engaged in the manufacture of lumber from timber growing upon its land. It had acquired this land in 1903 at a price of $20 an acre, but, owing to improvement in the market, the land was worth $40 per acre December 31, 1908. In making its returns under the act, the company deducted from its gross receipts the enhanced market value of the stumpage as of December 31, 1908. The act levied a tax

of 1 per cent upon "the entire net income over and above $5,000.00" received by corporations. In holding that the corporation properly made the above deduction, the court declared that the purpose of the act was to tax the conduct of corporate business according to its gainful activities from the time the act took effect. It regarded the timberlands as a part of the corporation's capital which the latter was entitled to value at its market worth on the day the law became effective. The court stated that the subsequent change in the form of this capital asset from timber into money did not change its nature as capital.

We dismiss the decision just reviewed and others like it as of but little assistance in determining the problem before us, and turn to *Lynch v. Turrish*, 247 U. S. 221 (62 L. Ed. 1087, 38 S. Ct. 537); *Lynch v. Hornby*, 247 U. S. 339 (62 L. Ed. 1149, 38 S. Ct. 543); *Southern Pacific Co. v. Lowe*, 247 U. S. 330 (62 L. Ed. 1142, 38 S. Ct. 540); *Peabody v. Eisner*, 247 U. S. 347 (62 L. Ed. 1152, 38 S. Ct. 546), which are cited in the briefs of both parties.

In *Lynch v. Turrish*, the facts were that March 1, 1913, the plaintiff was a stockholder in the Payette Company. Prior to March 1, 1913, this company had invested $1,375,000 in timberlands which on the day just mentioned were worth $3,000,000. The increase was due solely to market improvement. March 1, 1913, Turrish's stock was worth twice its par value. At that time all of the stockholders gave an option to sell their stock at double its par value. The optionee concluded to make the purchase but preferred to buy the assets of the corporation instead of the stock. The transaction was concluded in accordance with his preferences at a price which yielded to each stockholder twice the par

value of his stock. At the time of payment each stockholder surrendered up his certificate of stock and received a sum double the par value of his stock. At the conclusion of this transaction the Payette Company had no property of any kind. The statute exacted a tax "upon the entire net income arising or accruing from all sources * * *. The net income of a taxable person shall include gains, profits * * * also from interest, rent, dividends * * *." In holding that Turrish's receipts from this transaction were nontaxable, the court regarded the transaction, not as the receipt of a dividend by Turrish, but as a sale of his stock. It pointed out that the amount received by him "manifestly was a single and final dividend in liquidation of the entire assets and business of the company, a return to him of the value of his stock upon the surrender of his entire interest in the company, and at a price that represented its intrinsic value at and before March 1, 1913, when the act took effect".

In *Lynch v. Hornby*, supra, the facts were that Hornby, from 1906 to 1915, was the owner of some shares of the capital stock of the Cloquet Lumber Company which for more than a quarter of a century had been engaged in purchasing timberlands, manufacturing the timber into lumber and selling the product. The company's capitalization was $1,000,000 divided into shares of $100 par value. On March 1, 1913, through increase in the value of the timberlands and other business operations, the value of the company's properties was $4,000,000 and Hornby's 434 shares were worth $150,000. In 1914 the company distributed dividends aggregating $650,000 of which $240,000 was derived from current earnings and $410,000 from conversion into money of timber owned March 1, 1913. Hornby's share of the sum just mentioned was $17,794, and he

contended that it was nontaxable. This case was argued in the Circuit Court of Appeals with *Lynch v. Turrish,* supra. That court believed that the two cases were analogous and were controlled by the same principle of law. The United States Supreme Court felt otherwise. In holding that the sum last mentioned was subject to taxation under the federal 1913 income tax act, it declared:

"In our opinion it is distinguishable from the Turrish case, where the distribution in question was a single and final dividend received by Turrish from the Payette Company in liquidation of the entire assets and business of the company and a return to him of the value of his stock upon the surrender of his entire interest in the company, at a price that represented its intrinsic value at and before March 1, 1913, when the Income Tax Act took effect.

"In the present case there was no winding up or liquidation of the Cloquet Lumber Company, nor any surrender of Hornby's stock. * * * The operations of this company in the year 1914 were, according to the facts pleaded, of a nature essentially like those in which it had been engaged for more than a quarter of a century. * * * And we deem it equally clear that Congress was at liberty under the Amendment to tax as income, without apportionment, everything that became income, in the ordinary sense of the word, after the adoption of the Amendment, including dividends received in the ordinary course by a stockholder from a corporation, even though they were extraordinary in amount and might appear upon analysis to be a mere realization in possession of an inchoate and contingent interest that the stockholder had in a surplus of corporate assets previously existing. * * * We repeat that under the 1913 Act dividends declared and paid in the ordinary course by a corporation to its stockholders after March 1, 1913, whether from current earnings or from a surplus accumulated prior to that date, were taxable as income to the stockholder. * * *

Of course we are dealing here with the ordinary stockholder receiving dividends declared in the ordinary way of business. Lynch v. Turrish and Southern Pacific Co. v. Lowe, rest upon their special facts and are plainly distinguishable.''

. In *Southern Pacific Co. v. Lowe,* supra, the facts were: The Southern Pacific Company was the owner of all of the stock of the Central Pacific Railway Company. Long before acquiring this stock it had obtained a lease upon all of the properties of the railway just mentioned which remained in effect after its acquisition of the stock. The Southern Pacific Company was in the actual physical possession of the Central Pacific and in charge of all of its operations. It acted as cashier and banker for the Central Pacific which had no bank account. As a result of these operations, there appeared upon the books of the Central Pacific Company a large surplus accumulated prior to January 1, 1913, principally in the form of a debit against the Southern Pacific Company. The latter company, as sole stockholder of the Central Pacific and in control of its board of directors, was able to and did control the dividend policy of the Central Pacific Company. In 1914 a dividend was declared by the Central Pacific Company out of this surplus, but its payment was carried into effect merely by bookkeeping entries which reduced the apparent surplus of the Central Pacific Company and reduced the apparent indebtedness of the Southern Pacific Company to the other railroad. The court held that this dividend was not taxable under the same act which was construed in the two preceding decisions. It is apparent from the decision that the court deemed the two corporations as one. It said:

''While the two companies were separate legal entities, yet in fact, and for all practical purposes they

were merged, the former being but a part of the latter, acting merely as its agent and subject in all things to its proper direction and control. And, besides, the funds represented by the dividends were in the actual possession and control of the Southern Pacific as well before as after the declaration of the dividends. * * * Under the circumstances, the entire matter of the declaration and payment of the dividends was a paper transaction to bring the books into accord with acknowledged rights of the Southern Pacific.''

The court made it clear that it did not deem the Southern Pacific as an ordinary stockholder. It said:

"But this is not the ordinary case. * * * Our view of the effect of this act upon dividends received by the ordinary stockholder after it took effect but paid out of a surplus that accrued to the corporation before that event, is set forth in Lynch v. Hornby.''

To similar effect see *Gulf Oil Corp. v. Lewellyn,* 248 U. S. 71 (63 L. Ed. 133, 39 S. Ct. 35), upon which the plaintiff also relies. There the dividend declared by the subsidiary corporation in favor of the holding corporation was deemed as "bookkeeping rather than as 'dividends declared and paid in the ordinary course by a corporation'.'' See also 80 Penn. Law Rev. 892.

The facts in *Peabody v. Eisner,* supra, are: Peabody on and prior to March 1, 1913, owned 1,100 shares of the common stock of the Union Pacific Railroad Company, of the par value of $100 each. That company was the owner of large quantities of the corporate stock of the Baltimore & Ohio Railroad Company. March 2, 1914, the Union Pacific declared and paid an extra dividend upon each share of its common stock amounting to $3 in cash and $34.50 in par value of stock of the Baltimore & Ohio. In this manner Peabody received $3,300 in cash and 379½ shares of Baltimore & Ohio stock. In his income tax return for 1914 he included as

taxable income $4.12 per share of Union Pacific dividend, contending that all of the balance of his receipts constituted a part of the surplus of the Union Pacific which it had accumulated prior to the enactment of the federal income tax statute. In holding that he was subject to a tax upon the entire dividend, the court declared:

"In this case the plaintiff in error stands in the position of the ordinary stockholder, whose interest in the accumulated earnings and surplus of the company are not the same before as after the declaration of a dividend; his right being merely to have the assets devoted to the proper business of the corporation and to receive from the current earnings or accumulated surplus such dividends as the directors in their discretion may declare; and without right or power on his part to control that discretion.

"It hardly is necessary to say that this case is not ruled by our decision in Towne v. Eisner, since the dividend of Baltimore & Ohio shares was not a stock dividend but a distribution *in specie* of a portion of the assets of the Union Pacific, and is to be governed for all present purposes by the same rule applicable to the distribution of a like value of money. It is controlled by Lynch v. Hornby, this day decided."

From *Van Dyke v. Milwaukee*, 159 Wis. 460 (146 N. W. 812, 150 N. W. 509), we quote:

"Are dividends declared and distributed during 1911 by a going mining corporation out of surplus on hand prior to January 1, 1911, when the income tax law went into effect, taxable as income for 1911? An affirmative answer must be given to this question, because the statute provides that 'there shall be assessed, levied, collected and paid a tax upon incomes received during the year ending December 31, 1911.' The plaintiff received this income during 1911. It was immaterial when it was earned by the corporation. As a stockholder he acquired no right to it until it was distributed in the form of a dividend. The profits of a

corporation become income to stockholders when distributed as dividends, but not before.''

See to like effect *State ex rel. Sallie F. Moon Co. v. Wisconsin Tax Commission*, 166 Wis. 287 (163 N. W. 639, 165 N. W. 470).

In *Lapham v. Tax Commissioner*, 244 Mass. 40, 138 N. E. 708, the plaintiff, a stockholder in the American-Hawaiian Steamship Co., sought the abatement of an income tax assessed upon a dividend paid to him by that corporation out of a surplus existing before the enactment of the statute. His complaint was dismissed. The facts, in addition to those already indicated, were: The company owned, among others, eight steamships which were carried on its books at a value of $2,986,466.19, but which had a market value on January 1, 1916, of $10,000,000. It sold seven of these vessels and recovered insurance upon the eighth when it was destroyed. In this manner the eight ships brought the company $11,-461,562.22, or a profit of $8,475,098.03. At the conclusion of these transactions the company distributed in a dividend to its stockholders this entire profit, together with a large amount of other profits, but retained assets in excess of its liabilities and capital stock. The 1916 income tax statute of Massachusetts, after imposing a tax upon income, including income received in the form of dividends, provided:

''No distribution of capital, whether in liquidation or otherwise, shall be taxable as income under this section; but accumulated profits shall not be regarded as capital under this provision.''

The court held that the plaintiff's portions of this dividend were taxable. We quote the following from the decision:

''The argument that the income is not taxable to the complainant under St. 1916 c. 269, § 7, now G. L., c. 62,

§ 7, because the increase in value of the property of the corporation came before January 1, 1916, is met by the decision to the contrary in   *   *   *.''

█ From these authorities—and we know of none to the contrary—it appears that a dividend declared and paid by a corporation in the ordinary course of its affairs while it is pursuing the business activities for which it was formed is deemed a part of the stockholder's income as the word ''income'' is defined in acts similar to ours, unless the stockholder is a corporation whose identity has become so merged with that of the other corporation that the two are really one. If, however, the corporation has abandoned its pursuits and has sold its property preparatory to terminating its existence, the sum which the stockholder receives upon surrender of his stock certificate will not be deemed a dividend but will be regarded as the sale price of his stock. We believe that these decisions indicate the interpretation which should be placed upon our act. As already stated, if the stockholder is not a corporation which has absorbed the dividend-declaring corporation, the two are regarded as separate entities. The surplus belongs to the dividend-declaring corporation and not to the stockholder. We remind ourselves that the tax is levied neither upon the surplus nor the dividend but upon the stockholder. The dividend is merely a measure by which the size of the tax is, in part, measured. Our statute interpreted in the light of the above decisions employs the term ''dividend'' in its ordinary and not in its technical sense. It does not expressly exclude a dividend paid out of a surplus. As ordinarily understood, a dividend is a dividend even though it is paid out of a surplus; likewise, as ordinarily understood, a liquidating dividend which

is paid, incidental to the conclusion of the corporation's life, is not a dividend; it may be merely a return of capital. The plaintiff is apprehensive that if we apply to the word "dividend" as used in our act its common meaning liquidating dividends and stock dividends will be included. But taxation is a very practical matter, and we are satisfied that practical reasons will readily be found for excluding all forms of dividends from gross income which are not declared by going concerns in the regular course of business. The reasons expressed above persuade us that the mere fact that $15,025 of the plaintiff's 1931 dividend was paid out of a surplus existing before the Intangibles Income Tax Act of 1931 became effective did not render it nontaxable.

The question now occurs whether the distribution of this sum of money was a liquidating dividend. When this distribution was made the corporation was still transacting business in the same manner as it had done from its inception. Two per cent of its land remained unsold and a surplus, which a year previously amounted to $1,792,477.57, remained upon its books. December 31, 1929, this surplus was $496,949.12 after having been reduced by distributions made to the stockholders since 1902. The increase from the sum just mentioned to $1,792,477.57 was due, according to the complaint, "solely to the increase in the value of its holdings and the sales thereof aforesaid for sums in excess of the cost". The articles of incorporation are not before us, but the record indicates that the corporation was organized for the purpose of purchasing land, converting it into cash at an enhanced price, and distributing the proceeds to the stockholders. But in 1931 all of the land had not been converted into cash. Much of the

conversion had not gone further than the contract stage. Apparently, it will be necessary to execute and deliver deeds to the purchasers when they have completed payment of the purchase price. So long as land remains unsold, deeds remain unexecuted and contracts remain unperformed, the time has not been reached when liquidation is possible. Thus in 1931 the corporation was actively engaged in business and the dividend declared in that year was not an extraordinary event, but was one performed in the ordinary course of the corporation's affairs. In *Peabody v. Eisner,* supra, and *Lapham v. Tax Commissioner,* supra, the dividends were paid out of surplus and reduced the latter materially; yet neither was deemed a liquidating dividend. Most corporations expect to replace the reduced surplus with new money derived from further earnings, but the mere fact that a corporation like this one does not expect to do so does not transform the dividend paid out of surplus into something else. Liquidation will be reached when the surplus is gone or the corporation proceeds to terminate its existence.

*Commissioner of Internal Revenue v. Straub,* 76 Fed. (2d) 388, *Gossett v. Commissioner of Internal Revenue,* 59 Fed. (2d) 365, and *Anderson v. Burgess,* 110 Or. 265 (223 P. 244), upon which the plaintiff relies, indicate that before a dividend can be regarded as a liquidating dividend the business of the corporation must have terminated and the corporation must be in the process of dissolution. In the first of these three cases the business which had been prosperous, but which had become a losing venture, was being wound up by the family which operated the corporation. In *Gossett v. Commissioner of Internal Revenue,*

supra, the stockholders had authorized the sale of the mills owned by the corporation preparatory to winding up its affairs. Out of the sale price a 50 per cent dividend was declared, followed shortly by another which required the surrender of the certificates of stock. The decision held that these dividends were liquidating dividends, pointing out:

"Certainly at the time of payment of the dividend in question [that is, the first] the corporation was not a going concern in the legal sense as its dissolution was already under way.   *   *   *   The record shows that it was a very unusual dividend, and entirely outside of the due course of the business of the corporation."

In *Anderson v. Burgess*, supra, the contract of dissolution stated that the corporation "is this day dissolved by mutual consent".

■ It is our belief that the 1931 dividend was not a liquidating dividend. We believe that the statute contemplates that this dividend should be included in the stockholder's return.

We do not believe that when the word "dividend" is construed in the above manner any unwarranted discrimination exists between one whose income is derived from interest and another whose income is dependent upon dividends, even though the commission does not require that interest earned before the act took effect, but not paid until after that time, should be included in the taxpayer's return. The shareholder has no property right in the corporation's funds before a dividend is declared, but in behalf of the holder of an interest-bearing obligation a debt is accruing in the hands of his obligor which he can enforce at the appropriate time. This difference is recognized in the daily transaction of dealing in securities. A bond is sold for

its market price plus accrued interest, whereas a share of stock is sold at its market price with nothing added on account of a prospective dividend. In other words, the two groups of individuals have classified themselves and the adoption of this classification by the legislature cannot be deemed unreasonable.

■ It is true that the tax commission created by the 1923 income tax statute promulgated rules with which our above-indicated interpretation is not in harmony. We also observe from the complaint that one of the defendant commissioners in a letter to the plaintiff interpreted our present act in a manner different from the above. These administrative interpretations are important and helpful, but not controlling. We have given them careful consideration. Our interpretation of the act, however, is indicated in the foregoing paragraphs.

The above, we believe, is sufficient to indicate our disposition of the several contentions advanced by the plaintiff. It follows that, in our opinion, the circuit court erred when it overruled a demurrer to the complaint and also when it entered a decree in favor of the plaintiff. The decree is reversed. Costs and disbursements will not be allowed.

BEAN, C. J., and BAILEY, KELLY and RAND, JJ., concur.

CAMPBELL and BELT, JJ., did not participate.

Petition for rehearing denied May 11, 1937

On Petition for Rehearing

(68 P. (2d) 474)

ROSSMAN, J.   The petition for a rehearing and its accompanying brief, besides insisting that our decision erred when it refused to deem the dividend received by the plaintiff in 1931 from the Oregon Land and Livestock Company a liquidating dividend, calls attention to the fact that we erroneously stated that the date of that corporation's sale of some land to the Pelican Bay Lumber Company was October 1, 1931. The correct date, as the respondent points out, is October 1, 1928.   While we made this error in reporting our decision, we had the correct period of time in mind in our deliberations, as is evident from other parts of the decision.   The respondent contends that we erred when we stated that the Oregon Land and Livestock Company "was organized for the purpose of purchasing land, converting it into cash at an enhanced price and distributing the proceeds to the stockholders".   He states: "The corporation purchased lands, protected them, leased them for profit and, as opportunity arose, sold them.   The fair assumption from this course of business is that the articles of incorporation authorized the corporation to purchase and sell lands and lease them for profit."   Our decision stated that the articles of incorporation were not before us, and in making the above-quoted statement we did not intend to indicate that the articles of incorporation limited the concern's activities to a single purchase of land.   And we do not believe that the quoted language indicates that a single purchase only was permissible.   Certainly, we did not so believe when we wrote it.   We did not mention the leasing of the land because the complaint averred that

the income from that source was "inconsequential."
Apart from these criticisms of our statement of the record, the plaintiff finds no fault with it, although he disagrees with the inferences which we draw from the facts.

In support of his contention that the above-mentioned dividend was a liquidating dividend, respondent cites *Lynch v. Turrish,* 247 U. S. 221 (62 L. Ed. 1087, 38 S. Ct. 537); *Commissioner of Internal Revenue v. Straub,* 76 Fed. (2d) 388; *Gossett v. Commissioner of Internal Revenue,* 59 Fed. (2d) 365; *Canady, Inc., v. Commissioner of Internal Revenue,* 76 Fed. (2d) 278; *McNaghten v. United States,* 17 F. Supp. 509; *Tootle v. Commissioner of Internal Revenue,* 58 Fed. (2d) 576.

Before taking further note of these decisions, we shall mention briefly two facts which we did not set forth in our previous decision because we assumed that they were of subordinate importance; but we shall now mention them for the sake of completeness. One of these is the fact to which we referred in a preceding paragraph; that is, that the Oregon Land and Livestock Company derived rent from its land after, as well as before, the time when the alleged liquidation commenced. The complaint states that some of the land was adapted for grazing purposes and that the corporation "collected annually small and inconsequential sums for grazing privileges". The other fact is the circumstance that on June 28, 1929, representatives of the Oregon Land and Livestock Company and representatives of the Weyerhaeuser Timber Company procured the formation of a third corporation entitled the Bly Timber Company. After the latter had been organized the Oregon Land and Livestock Company conveyed to it the timberlands which our previous decision

states were sold to the Ewauna Box Company. At the same time the Weyerhaeuser Timber Company conveyed to the new company extensive timberlands adjacent to and intermingling with the tract just mentioned. Of the total lands conveyed to the new corporation 23.290896 per cent came from the Weyerhaeuser Timber Company and 76.709104 per cent from the Oregon Land and Livestock Company. Each received stock in the new corporation in proportion to the lands conveyed. After this had been done the Bly Timber Company entered into a contract with the Ewauna Box Company at a price which yielded to the Oregon Land and Livestock Company a larger sum than its previous contract. The purpose of creating this new corporation and of executing the new contract was to avoid the inconvenience and misunderstandings which the parties believed would otherwise arise.

We shall now review the six decisions above cited. *Canady v. Commissioner* concerns a dividend which the taxpayer received from a corporation entitled Dealers Finance Company, of which he was a stockholder. The decision refers to the facts as "complicated" and states that their complicated nature made the case "one wholly of its own kind." The following, quoted from the decision, states the pertinent facts:

"In March, 1928, it disposed of all of its assets with which it had carried on that business and never thereafter engaged in that business. * * * From that time until it made the distributions here in question, it carried on no business but limited its activities to the conversion into cash of some of the securities received in exchange for its former assets and to the retirement of its Class B stock. Then came December 26, 1928, with the resolutions and distributions described above. Thereafter the corporation was dead so far as its old business was concerned, a mere empty shell without

shareholders or property.  *  *  *  Later, new stockholders refilled the shell with different property. The corporation then went into a new and totally different life.  *  *  *  The facts here show that the corporation was in the course of liquidation at the time of the distribution and that it completed its liquidation on the same day. The distribution of the $500,509.69 was a step in that process.''

The court held that the distribution was a liquidating dividend. While the decision apparently does not state all of the facts, it will be observed that the liquidation stripped the corporation of all of its property, and each shareholder surrendered his certificate of stock upon receipt of his part of the distribution.

In *Tootle v. Commissioner*, supra, the disputed tax concerned a dividend declared by the Aunt Jemima Mills Company. Prior to November 24, 1925, the directors of that corporation received an offer from the Quaker Oats Company to purchase all of its assets except cash on hand ($146,330.19) and a claim against the federal government for a tax refund, at a price which, with the two items just mentioned, would yield to the stockholders at least $80 per share. The directors called a meeting of the stockholders and the sale was authorized. All of the assets, with the exception of the two items above mentioned, were then sold to the Quaker Oats Company for $2,000,000 cash, $1,202,077.28 upon delivery of assignments of trademarks, etc., and $1,000,000 within 15 days after delivery of deeds to the real property. The terms of the sale required the Aunt Jemima Company to liquidate, distribute its assets among its stockholders, and then either dissolve or assign its charter to the Quaker Oats Company. Next, the directors of the Aunt Jemima Company passed a resolution which, after resolving in favor of liquidating

the business as soon as practicable and distributing the assets to the stockholders, called a meeting of the stockholders for January 15, 1926, to determine what should be done. On the same day the directors declared a dividend of $25 per share of common stock. The resolution which declared this dividend, after reciting the terms of sale to the Quaker Oats Company, stated that it was payable out of surplus, and that it was part payment upon the expected total of $80 per share. It stated that the dividend was payable only upon presentation of stock certificates and requested all stockholders to forward their certificates to the company or to a St. Louis bank for endorsement of this and future payments. At their meeting on January 25, 1926, the stockholders authorized the directors to distribute the corporation's assets and then dissolve it. The court held that the $25 dividend was a liquidating dividend, and therefore not a part of the taxpayer's taxable income. It stated:

"The dividend was clearly intended by the directors to be a partial liquidation. * * * Here was a corporation which had sold its entire assets and business, and, as securing such results to the purchaser, had agreed to dissolve within a year. It had no future business except settlement of its tax refund claim, dissolution, and distribution. All of this had been sanctioned by the stockholders. * * * The only business for which it existed had entirely ceased, and it was obligated not to engage therein further."

In *Commissioner v. Straub,* supra, which is partially reviewed in our previous decision, the facts as stated by the court were, in part:

"The evidence, in our opinion, establishes that the distribution of 1928 was made in partial liquidation of the corporation's capital stock. This is true notwithstanding the fact that the method was that of reducing the face value of each outstanding share and not that of reducing the number of outstanding shares."

It will thus be seen that some form of corporate action was taken which reduced "the face value of each outstanding share" although the entire business was not immediately discontinued.

In *Gossett v. Commissioner*, supra, the controversy concerned a dividend which the taxpayer had received from a corporation entitled Brogan Mills. The difficulty had its inception on September 10, 1925, when the board of directors passed a resolution calling for a shareholders' meeting for October 13, 1925, to consider offers for all of the assets of their corporation, and also for the purpose of considering a resolution authorizing liquidation and dissolution. At the shareholders' meeting resolutions were passed authorizing the sale of the mills and dissolution upon sale. November 2, 1925, the sale was effected. December 15, 1925, the directors voted a dividend of 50 per cent which was paid out of cash received as part of the purchase price. On January 2, 1926, a "liquidating dividend" was declared and the directors advised the stockholders to surrender their certificates to the Hanover National Bank which was in charge of liquidation. December 7, 1927, a resolution of dissolution was adopted and was certified to the proper public official. The court held that the dividend of December 15, 1925 (50 per cent) was a liquidating dividend. In so holding, it stressed the importance of the fact that the commissioner of taxes had so held and pointed out that when the dividend was declared "the corporation was not a going concern".

*McNaghten v. United States*, supra, is a decision by the court of claims concerning a tax refund. The tax had been imposed upon a sum received by the taxpayers from trustees of a testamentary trust who held

69,168 shares of the capital stock of a corporation entitled Holmby Corporation. This concern had been organized by one Arthur Letts whose will created the trust just mentioned. According to the statement of facts preceding the decision, "shortly after the death of Arthur Letts, his heirs agreed among themselves that Holmby Corporation should be liquidated and its assets distributed to its stockholders as soon as the same could be done without sacrifice". The court took liquidation for granted, and held:

"The amounts received by these plaintiffs in 1925-1926 were not taxable for the reason that they were liquidating distributions by the Holmby Corporation to the trust in respect to that corporation's stock."

*Lynch v. Turrish,* supra, is reviewed in our previous decision. We amplify the facts there stated with the following. Before the taxpayer received the dividend which he claimed was a liquidating one, he and all of his fellow-stockholders had given to the prospective purchaser options upon their stock, but the purchaser preferred to buy the assets of the corporation rather than the stock and offered to pay for them the total of all of the options. Then the following occurred:

"The stockholders by resolution authorized this sale, and, pursuant to this and a resolution of the directors, the Payette Company transferred to the new company all of its assets, property, and franchises, and upon the completion of the transaction found itself with no assets or property, except cash to the amount of double the par value of its stock which had been paid to it by the new company. * * * The cash was distributed to the stockholders on surrender of their certificates of stock, and the company went out of business."

Concerning these decisions, the plaintiff states:

"In each of the cases cited the facts were strikingly similar to, if not identical with, the facts in the instant case bearing upon the question of the character of the distributions."

We shall now state what we deem to be the differences between the instant case and those upon which the plaintiff relies. In the Aunt Jemima case the transactions which indicated liquidation may be summarized as follows: (1) A call for a meeting of the stockholders to consider an offer from the Quaker Oats Company for the purchase of virtually all of the assets of the corporation; (2) a resolution by the stockholders authorizing acceptance of the offer; (3) a sale on terms which gave the purchaser the right to use the vendor corporation's name and required the vendor corporation to liquidate and either terminate its corporate existence or, at the option of the purchaser, transfer the corporate charter to the latter; (4) a resolution by the directors favoring dissolution after distribution of all assets and calling a stockholders' meeting to authorize this course; (5) a resolution by the stockholders to that effect; (6) payment of the alleged liquidating dividend only on condition that the stockholder surrender his stock certificate for eventual cancellation; and (7) cessation of business of the Aunt Jemima Company, pursuant to its contract to do so.

The transactions in the Brogan Mills case were as follows: (1) A resolution by the board of directors calling a meeting of the stockholders to consider a sale of all of the assets of the corporation, liquidation and dissolution; (2) a resolution by the stockholders authorizing that course; (3) the sale; (4) the mills ceased to be a going concern; and (5) distribution of

the alleged liquidating dividend pursuant to a resolution of the directors which advised the stockholders to surrender their certificates of stock for eventual cancellation. In this case the liquidating corporation actually appointed a liquidating agent—the Hanover National Bank.

In *Lynch v. Turrish*, supra, the transactions were: (1) An option by each stockholder to the purchaser upon his shares of stock; (2) a counter-proposal by the purchaser to purchase all of the assets at a price equivalent to the total of all of the options; (3) a resolution by the stockholders authorizing acceptance of the counter-proposal; (4) the sale; (5) distribution to the stockholders of the sums received by the buyer upon surrender of their certificates of stock; and (6) cessation of all activities by the corporation. In the other three decisions the facts are not sufficiently stated to make possible an itemized summary, but in *Canady v. Commissioner* it appears that a resolution had been adopted authorizing a sale and that after the sale had been consummated the corporation was "dead so far as its old business was concerned, a mere empty shell without shareholders or property". In *Commissioner v. Straub* the course of liquidation included "reducing the face value of each outstanding share". And in *McNaghten v. United States* the fact of liquidation was taken for granted.

■■ Now let us compare the facts before us with those summarized in the preceding paragraphs. The complaint before us does not allege that either the stockholders or the directors at any meeting voted in favor of liquidation and dissolution; nor does it aver that either group adopted a resolution in favor of liquidation and dissolution. It is true that the complaint al-

leges that "long prior to the 31st day of December, 1929, by common consent of all of its stockholders and directors, it had been agreed that said corporation should engage in no business except such as was incidental to the protection of its properties and the sale and disposal thereof, * * * and that whenever said assets should be completely disposed of said corporation should be dissolved". But, as was said in *Vawter v. Rogue River Valley Can. Co.*, 124 Or. 94, (257 P. 23, 262 P. 851), "as a general rule, a corporation can act only through its board of directors at a regularly called meeting. The corporation ordinarily speaks through its records." From Fletcher, Cyclopedia Corporations (Perm. Ed.), § 1996, we quote:

"The corporation is a body of individuals united as a single separate entity. Therefore, the corporate powers, when vested in the stockholders or members, are vested in them collectively, as a body, and not as individuals. They have no power to act as or for the corporation except at a corporate meeting called and conducted according to law. Action by the stockholders or members individually, and not at a corporate meeting, even though a majority may concur, and even though their consent be expressed in a writing signed by them, is not the action of the corporation, and is void."

■ ■ Therefore, before the agreement mentioned in the complaint could amount to corporate action, a corporate meeting was necessary, accompanied with the adoption of a resolution authorizing liquidation and dissolution. We do not distrust the word of the stockholder who verified the complaint, but an issue of liquidation, when it affects the state's right to tax, ought not be dependent upon the oath of a stockholder. So far as the complaint discloses, the corporate records make no mention whatever of liquidation or dissolu-

tion, but are the same as the records of any going concern. All of the shares of stock are still in the hands of the shareholders and no endorsements of any kind have been made thereon. The capitalization has not been altered. But the surplus account, which on December 31, 1929, was $496,949.12, amounted to $1,792,477.57 in 1931, due to increase in the value of the corporation's assets. Liquidation in that period proceeded in inverse order. As stated in our previous decision, the corporation, during the period of alleged liquidation, conducted its affairs in the same manner as it had always done, except that it purchased no new large tracts of land. It, however, continued to purchase "small intermingling tracts of land". In *Lynch v. Turrish,* supra, and *Tootle v. Commissioner,* supra, as well as in others of the aforementioned cases where the corporation was engaged in some manufacturing venture, the period of dissolution was begun, not only by the adoption of a resolution authorizing it but also by a cessation of the corporation's regular activities. In the present instance, no cessation took place except discontinuance of the purchase of large tracts of land; all other operations continued as before. Even a subsidiary corporation (Bly Timber Company) was organized. The mere fact that no further large tracts were purchased and that receipts were distributed to the stockholders does not necessarily indicate liquidation. The corporation still had a very large surplus. Unlike the Aunt Jemima Company, the Brogan Mills Company, etc., the Oregon Land and Livestock Company, at the very outset, intended to sell its capital assets and thereby make its profits. It had no other means of earning profits. Hence, when it was distributing the proceeds of these sales it was doing the

very thing which it was contemplated, upon organization, it should do. Distributing the proceeds was not necessarily evidence of liquidation.

For the above and other reasons stated in our previous decision, we believe that substantial distinctions exist between the facts of this case and the others upon which the plaintiff relies. We believe that the recipient of a dividend who claims that it came from a corporation in the course of liquidation ought to be required to point to a corporate record inaugurating liquidation, or to show that the corporation substituted for the course of business previously pursued one which will deprive it of all its assets and stockholders. Finding neither in this case, we are satisfied that our decision did not err, and, therefore, the petition for a rehearing must be denied.

BEAN, C. J., and BAILEY, KELLY and RAND JJ., concur.

CAMPBELL and BELT, JJ., did not participate.