### Petty, et al. v. Hagan.

(Decided October 28, 1924.)

Appeal from Allen Circuit Court.

1.  Corporations—"Dividend" is Fund Set Apart to be Divided Among Stockholders.—"Dividend," as applied to corporate stock of going concern, is always understood as fund which corporation sets apart

from its profits or net earnings to be divided among its members, and has no existence until declared.

2. Corporations—Until Declaration of Dividend Profits do Not Belong to Stockholders Individually.—Surplus profits or net earnings of corporation are not "dividends" but part of its assets, and do not belong to stockholders individually, except as dividends are declared.

3. Assignments—Note Held Given for Dividend to be Declared and Not Net Profits.—A note given to stockholder for "the made net earnings dividend for the year 1919 ending when dividend is declared" held to evidence sale of declared dividend and not net earnings for year.

HARPER & DENTON for appellants.

W. D. GILLIAM for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

L. M. Petty was a tobacco dealer, and G. A. Hunt was the general manager and secretary and treasurer of the Farmers' Loose Leaf Tobacco Warehouse Company, of Scottsville. The outstanding capital stock of the company amounted to $17,000.00, and J. W. Hagan was the owner of stock of the par value of $1,900.00. On January 30, 1920, Petty, as principal, and Hunt, as surety, executed and delivered to Hagan the following note:

"We or either of us promise to pay J. W. Hagan the sum of $570.00 five hundred and seventy dollars for the made net earnings dividend for the year 1919 ending when dividend is declared for the Farmers' L. L. Tobco., Scottsville, Ky., let this dividend be much or little on $1,900.00 worth of stock."

The net earnings of the corporation for the 1919 season were 25⅛%, but the directors declared a dividend of only 10%.

Hagan brought this suit to recover on the note. The defense, in brief, was that Petty bought the entire net earnings on Hagan's stock; that there was a failure of consideration to the extent that the earnings were not delivered to him; and that he was liable only for the difference between the face of the note and the entire net earnings. Proof was heard by deposition, and on the final hearing the court rendered judgment in favor of Hagan for $570.00 with interest from March 15, 1920. From that judgment this appeal is prosecuted.

The evidence was all heard without objection. After testifying that the note was given for dividend on $1,-900.00 worth of stock, and that he had offered to give Petty an order on the corporation for the dividend, Hagan testified on his direct examination as follows:

"Q. Was it understood and a part of the agreement that you were to collect this dividend check and pay it to Mr. Petty? A. No, sir, it was to be paid when the dividend was declared.

Q. Now I notice in the note it is inserted that these gentlemen agreed to pay you $570.00 for the dividend returned, that that dividend be much or little, what did you understand by that? A. I told them it didn't make no difference what it made, they would get the dividend and they would get it any way, let it be little or much, and Mr. Petty said it didn't make no difference he would take it.

Q. It mattered not what that dividend was, you understood it was to pay you $570.00? A. Yes, sir.

Q. And for that reason it was written in the note the words, 'let the dividend be much or little?' A. Yes, sir.

Q. And they did understand it that way? A. I reckon they did; they signed the note."

On cross-examination he testified as follows:

"Q. You and Mr. Petty were both buying and selling tobacco across the floor? A. Yes, sir, I sold some; I have got mine yet; I didn't sell very much.

Q. How did you all arrive at that particular figure of $570.00? A. Well, he agreed to give 30% and I said we will not have the per cent in it and we figured and it figured $570.00.

Q. It is figured at 30%, that is the way you arrived at it? A. This is right.

Q. Wasn't there something, after that note was written, wasn't some more words added in it before it was signed, about the 'made dividend?' A. No, sir, I don't think there was about the 'made dividend.' I will tell you how it was, it was made—the note when we wrote it, the note for made dividend, so Mr. Hunt was out when Roy Calvert drawed up this note and Mr. Hunt went out on the floor and I don't remember who called him, but we called him and I stepped out and when I come back, it wasn't

over two minutes, and Mr. Hunt had signed it and changed the net earnings to 'made dividend,' was already there, and he said Jim, I put net earnings, and I said, Alex, that ain't right, he said it amounted to about the same, it don't make no difference Lewis had done signed it when it was changed, that is all that was changed.

Q. You accepted the note? A. Yes, sir.

Q. What did you understand the 'made dividend' or 'net earnings' to mean? A. It meant the dividend.

Q. Didn't you understand and wasn't it true you was selling to them what that stock made and not what was actually declared? A. It don't say nothing about the declared dividend.

Q. In the presence of Roy Calvert and Mr. Hunt and Mr. Petty also, didn't Petty say, I am buying what is made? A. I don't remember it that way.

Q. How do you remember it? A. He bought the dividend.

Q. Was anything said about what it actually made and not what might be declared? A. No, sir.

Q. You were present at the time? A. I don't remember; I guess more than Roy was there, but that is all I remember.

Q. Alex Hunt was there? A. Not when this was said, I don't think.

Q. You all had discussed this some time before the sale? A. Yes, sir; he asked me what I would take for my dividend; he said, I will give 25%, and I said I will take 30%, and he said I will trade with you; nobody present but me and Petty.

Q. Was that all closed up there at one time? A. Yes, sir, me and him out on the floor.

Q. You all hadn't talked it *pro and con.* before? A. No, sir.''

On his direct examination, Petty, after stating that he was engaged in buying and selling tobacco on the floor of the warehouse and that the warehouse was having a pretty good season, testified as follows:

''Q. How came you to buy this dividend of Mr. Hagan's? A. Well, I asked what he would take for

it and he told me and I bought it just to be trading for speculation.

Q. What was said there about it? A. I asked what he would take and I believe he said 30%, and I said I will give 25%, and he said no, I think it will make 30% or more, and I said I do too, and he said you will have to make me safe, and I said I will and you draw up the contract, and he said all right, and he drawed up the contract, and I said before we begin, you understand I am buying the 'made dividend,' there is a difference in the 'made' and declared and he said he didn't know. I said, well I don't know what the board of directors will do, but what it makes is what I am buying, and he said all right, and we specified in the note I was to have the 'made dividend' or 'net earnings' for that year, and I executed the note for $570.00 on $1,900.00 worth of stock, his figures 30%, that is what I was to give and what I owe him.

Q. Was anything else written in that contract? A. Well, I don't know that I can remember every word of it; there was something said about let the dividend be much or little; I don't recollect what else.

Q. Was anything said about the 'net earnings?' A. Yes, sir, I think the note specifies that.

Q. What were the 'made dividend' or 'net earnings?' A. Well, 25¼% or 25⅛% is the way I understand it.''

On cross-examination his testimony was as follows:

''Q. You say you were speculating when you executed this note? A. Yes, sir.

Q. You had an idea, didn't you, that the corporation would make or pay more than 30% or you wouldn't have executed the note? A. I thought so.

Q. For that reason you had Calvert, who was the bookkeeper there at the warehouse, to write into the note the words, 'let this dividend be much or little?' A. Yes, sir, he wrote that.

Q. You understood it didn't matter how big or how little the dividend was, you owed Jim Hagan $570.00? A. Yes, sir.

Q. And the note was payable when the dividend was declared by the corporation? A. I don't know it said when the dividend was declared.

Q. That was written into the note? A. I think so.

Q. That was the time of the maturity of the note? A. Yes, sir, I think so.

Q. When this corporation declared its dividend for the year ending, when the season ended in 1920, that you owed Mr. Hagan $570? A. Yes, sir, that it when it was to be paid."

Hunt, after saying that he remembered signing the note, testified as follows:

"Q. Tell just what you know about that? A. I don't know anything only what they told me about the time the note was signed; so far as hearing the trade I never heard it that I have any recollection of now until they called me in to sign the note and I signed it, and about that time, I don't know whether it was right then or later, they told me how the trade was, Lewis bought his dividend at 30%.

Q. What dividend was that? A. Well my recollection just like the note states, 'made dividend.' I know the 'net earnings' is in there because I inserted it in there and I had forgot it until him and Lewis talked about it and then I recollected.

Q. You wrote into the note 'net earnings?' A. I think that is it; I wrote something in it.

Q. What does 'made dividend' and 'net earnings' mean? A. Well, I take it to mean what was actually made, and after all expenses were met.

Q. That didn't mean what the directors would declare as a dividend? A. No, sir."

It will be observed that Petty claims that he stated to Hagan that there was a difference between a "made" and "declared" dividend, and Hagan said he didn't know. Thereupon he told Hagan that he didn't know what the board of directors would do, "but what it makes is what I'm buying, and he said all right," and they specified in the note that Petty was to have the "made" dividend or "net earnings" for the year. On the other hand, Hagan, after testifying that Petty "bought the dividend" and that nothing was said about what was actually made or what might be declared, sums up the

transaction in the following language: "Yes, sir, he asked me what I would take for my dividend. He said I will give 25%, and I said I will take 30%, and he said I will trade with you. Nobody present but me and Petty." Hunt says that he never heard the trade, but "they told me how the trade was. Lewis (Petty)' bought his dividend at 30%." In answer to the question, "What does 'made dividend' and 'net earnings' mean?" he said, "Well, I take it to mean what was actually made and after all expenses was met." As Hagan testified one way and Petty the other, and Hunt merely gave his construction of the contract, it is apparent that the oral evidence throws but little light on the transaction. After all the question is, what did Petty agree to pay Hagan $570.00 for? The language of the note is "for the made net earnings dividend for the year 1919 ending when dividend is declared for the Farmers' L. L. Tobco. Scottsville, Ky. let this dividend be much or little on $1,900.00 worth of stock." It does not say that Petty promised to pay the $570.00 for the "net earnings," or for the "made net earnings," but for the *"made net earnings dividend"* for the year 1919, "ending when *dividend* is declared, let this *dividend* be much or little."

A divided as applied to the corporate stock of a going concern is always understood as a fund which the corporation sets apart from its profits, or net earnings, to be divided among its members. Mobile & O. R. Co. v. Tennessee, 153 U. S. 486, 38 U. S. L. ed. 793, 7 R. C. L. 283. "Dividends" and "profits," or "net earnings," are not synonymous terms. The profits or net earnings of a corporation are not "dividends" until so declared or set apart by the corporation so as to become the property of the stockholders. Knight v. Alamo Mfg. Co., 190 Mich. 223, 157 N. W. 24; Lockhart v. Van Alstyne, 31 Mich. 76, 18 Am. R. 156. In other words, a dividend has no existence until declared, and in the meantime the surplus profits or net earnings of a corporation are a part of its assets, and do not belong to the stockholders individually. Gibbons v. Mahon, 136 U. S. 549, 34 L. Ed. 525; Bowman v. Breyfogle, 145 Ky. 443, 140 S. W. 694; Ann. Cas. 1914B 938. Of course a dividend should be "made" before it is declared, and should be declared only out of "net earnings" or surplus profits. The word "dividend" occurs three times in the note, and neither the qualifying words "made net earnings" nor the state-

ments of Petty are sufficient to show that the sale embraced property not fairly covered by the term employed to describe the subject matter of the sale, especially in view of the fact that Hagan had no title to, and never could transfer or deliver to Petty any of the net earnings on his stock in excess of the dividend actually declared. As the circuit court reached the same conclusion, it follows that the judgment is correct.

Judgment affirmed.