STATE, EX REL. C. A. SORENSEN, ATTORNEY GENERAL, V. NEBRASKA STATE BANK OF O'NEILL ET AL., APPELLEES: S. S. WELPTON, TRUSTEE, APPELLANT.

FILED MAY 20, 1932. No. 28155.

*Arthur F. Mullen* and *James A. Donohoe*, for appellant.

*F. C. Radke, Barlow Nye, G. E. Price* and *Julius D. Cronin, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

EBERLY, J.

This action arises out of the receivership and liquidation of the Nebraska State Bank of O'Neill, Nebraska, an insolvent institution. S. S. Welpton, as trustee, and a stockholder therein, for and on behalf of himself and stockholders like situated, by a petition in intervention, set forth the creation out of the earnings of this institution of a fund which was commenced in 1912 and thereafter from time to time was added to until such contributions aggregated $42,743.91, and which fund from the time of its inception was carried as a general deposit in said bank under the name of S. S. Welpton, Trustee. As to the contributions thus made, it is further alleged that the Nebraska State Bank had no interest, right, or title therein; that they were the property of the stockholders thereof, for whose benefit the trust was created. It alleges the misapplication of this trust fund by the bank and its officers and the expenditure thereof by them for the bank's own use and benefit, in violation of the terms of the trust. It prays for an accounting and an order requiring the receiver to deliver to the petitioner all property in his possession which represented the fruits of this fund thus unlawfully disposed of, including a certain promissory note in the sum of $7,524.86. It further asks for judgment for so much of such fund as is not otherwise accounted for.

To this pleading the receiver filed his answer containing, in addition to a general denial, an admission of the deposit of the various amounts in the Nebraska State Bank in the name of S. S. Welpton, Trustee, substantially as alleged by intervener, but further alleges that said

moneys so deposited belonged to said bank, were a part of the assets thereof, and were at all times under the control of its officers, and, except for $222.93, which was the present balance, had been lawfully paid out for its use and benefit.

The intervener's reply in effect denied generally all new matter alleged in the answer. A trial to the court resulted in a finding that the intervener "is not entitled to a trust fund or a claim, either general or preferred, against said bank or the assets thereof," and a judgment dismissing his petition. Thereafter the intervener presented his motion for a new trial, and from the judgment overruling the same appeals.

The controlling question in this case is whether this fund in suit, and the benefits proceeding therefrom, is the property of the stockholders represented by the trustee, or constitutes assets of the bank to which the depositors thereof, represented by the receiver, have prior claims under the provision of statutory liens in their behalf. There is no question in the record as to the source of $40,351.98 of the moneys in dispute. Each of seventeen annual deposits to the credit of the account of S. S. Welpton, Trustee, in this bank, which together make up this sum, were wholly derived from the earnings and profits of this institution preceding the dates of such deposits.

It is not denied that at least one of the purposes sought to be provided for by the creation of the fund carried on the books of this institution in the name of S. S. Welpton, Trustee, was the erection of a new brick building for the Nebraska State Bank of O'Neill. It also appears that this account was first opened on March 31, 1912, and that annual credits were thereafter regularly made therein to and including March 1, 1928, inclusive; that the aggregate of the funds thus entered in said account is $40,351.98. Each one of these entries evidencing such transfers, it appears, was authorized and made pursuant to resolutions duly adopted at the annual meeting of the

board of directors of said bank for the year in which each of such credits was entered. The first resolution adopted by the board of directors was passed in March, 1912, in the following form: "Resolution offered and adopted that the sum of $3,250 be and the same is hereby appropriated from the profits and loss account and declared to be a dividend to the stockholders and shall be distributed as follows: $2,500 in cash to be paid out *pro rata* upon the paid-up capital stock of the bank to stockholders of record of this date, and $750 to be placed on deposit in the name of S. S. Welpton as trustee, to be utilized and expended in the interest of the bank or for contemplated improvements in real estate in such manner and at such times as the board of directors at any regular meeting may determine." Each of the annual resolutions as subsequently adopted by this board vary somewhat in phraseology, but each and all, either directly or by reference or necessary implication, express the thought that the deposit by it directed to be made to the credit of the trustee account was to be disposed of "in the interest of the bank * * * in such manner and at such times as the board of directors at any regular meeting may determine." It also appears that at the annual meeting of 1913 an additional resolution was duly adopted in the following terms: "Resolution offered and adopted that the cashier be authorized to loan the trust fund standing in the name of S. S. Welpton, Trustee, in such manner and under such terms as he may deem advisable, the interest and accumulations to be carried as a part of such fund." Thus it is plain that in terms the so-called "trustee" was vested with no power over, or control of, the fund in suit, save and except such as may be implied from his title, necessarily of course modified by the express powers conferred on the board of directors of the bank and interest as beneficiary expressly vested in that institution. *Hill v. Hill,* 90 Neb. 43.

While it is not entirely clear, it is assumed to be established, for the purpose of this case, that the three ad-

ditional items totaling $2,391.93, which also appear as credits in this account, were the proceeds of investments of this fund pursuant to the resolution last referred to, and constituted accumulations thereof, and were thus wholly derived from the earnings and profits of the bank that had been transferred or credited to this trustee account.

There is no evidence in the record that the stockholders of this bank, as such, were ever notified of the creation of the trust fund in suit by the board of directors, or ever approved that action, or, as a body, in any manner assented to its continued maintenance.

It also appears that by regular and continued course of dealing, which was begun not later than 1919 and continued substantially without interruption at least until May 9, 1928, said fund, excepting the sum of $222.93, was wholly disbursed by O'Donnell while serving as cashier and president, and being then the executive officer in immediate charge of the business of the bank. As to the method employed, it appears that it was paid out on checks executed in the name of S. S. Welpton, Trustee, or upon debit slips, all of which were either executed and actually signed by O'Donnell, or the signatures thereto authorized by him.

It must be said, however, that the proceeds thus withdrawn from this fund were employed in removing "bad" or "dead" paper from the bank; in aiding it to carry its excess loans; in paying and discharging its indebtedness, its guaranty fund assessments, and other like charges; and in general providing for the payment of the bank's obligations. It may be said that, excepting the sum of $1,100, all moneys thus distributed may fairly be said to have been actually "utilized and expended in the interest of the bank." Indeed, intervener alleges "that all of said funds were appropriated by the Nebraska State Bank and expended for its use and benefit." It must be further noted that no concealment of what had occurred appears to have been practiced, and that the several transactions

were entered in the records of the bank in due and regular course, and were actually inspected at the semiannual meetings of the board of directors (which appear to have been regularly held), who, it must be said, had at all times full knowledge of what had transpired. Though it must also be said that there is no record of any formal preauthorization of the acts of the executive officers with reference to this account, still it affirmatively appears that during said time S. S. Welpton, the trustee, served continuously as a director of this institution, was a regular attendant at the board meetings, and thus obtained and actually had full knowledge of these transactions within a comparatively short time after their occurrence. 7 C. J. 783; *Cox v. Robinson*, 82 Fed. 277.

It is to be remembered that earnings and profits in the possession of a corporation "belong to the corporation the same as the property generally, and for this reason there is nothing due and owing a stockholder from the profits as a matter of debt, until a dividend is declared in some appropriate manner. Until the time the dividend is declared it is only a potentiality, something that may possibly come into existence; * * * It accordingly follows that a stockholder has no legal title to the profits of the corporate business until dividends have been sufficiently declared; until such time a stockholder has only the right to receive his proportionate share of all profits. * * * The dividend before declaration and the right thereto is an incident of the stock and passes with it on sale of the stock." 7 Thompson, Corporations (3d ed.) sec. 5307. "When a dividend is declared by an appropriate and sufficient resolution there is then a severance of so much of the accumulated earnings from the corpus of the corporation's property or funds and it then becomes the individual property of the stockholders." 7 Thompson, Corporations (3d ed.) sec. 5308.

It is also true as a general rule that, after the dividend is declared, "it is no longer the profits of the corporation or undivided surplus; and while the distribution is based

on the number of shares held by each person, yet it is entirely severed both from the property of the corporation and from the stock as held by the owner and is individual property; consequently it does not pass with any subsequent transfer of the stock except by express agreement." 7 Thompson, Corporations (3d ed.) sec. 5317. See, also, *Cook v. Monroe,* 45 Neb. 349.

It is also obvious that the essential nature of the fund in suit must be determined by consideration of the language of the several resolutions, each considered as an entirety, and interpreted in the light of the surrounding circumstances. The fairly expressed intent of the board of directors, if not unlawful, must control. It may be conceded that, when considered as a technical term without regard to context in which it may be found, the word "dividend" is properly defined, as already indicated, as "that portion of the profits and surplus funds of a corporation which has been actually set apart, by a valid act of the corporation, for distribution among the stockholders according to their respective interests, in such a sense as to become segregated from the property of the corporation, and to become the property of the stockholders distributively." 14 C. J. 798. However, as well expressed by one of the distinguished English Judges: "The word 'dividend' carries no spell with it. Applicable to various subjects, it is not intelligible without knowing the matter to which it is meant as referring, and of course, where there is a context, it is liable to be affected by that context." *Henry v. Great Northern R. Co.,* 1 De Gex & Jones, 605, 641.

Here we have not only "a context" associated with the term "dividend," as employed in each of the resolutions adopted by this board of directors, but, in addition, a practical, uninterrupted, harmonious, and consistent interpretation of the language employed by the users thereof, as carried out in the actual business transacted by the bank extending over a period of more than nine years. During that time, and indeed prior thereto, all interests

treated the accumulations from time to time added to the so-called trust fund as intended solely "to be utilized and expended in the interest of the bank or for contemplated improvements in real estate in such manner and at such times as the board of directors at any regular meeting may determine." The fair import of the language quoted, especially in the light of the practical construction given it by the bank officers continuously down to the year 1928, not only expressly, but necessarily, negatives the thought that the effect of the corporate action in the transfer of funds to the "trustee account" was to require the profits and earnings placed in the trust fund to be distributed "among the stockholders according to their respective interests." On the contrary the corporation itself, as distinguished from the stockholders that composed it, in express terms was made the beneficiary of the fund, and its duly constituted officers, the board of directors, were expressly continued as the responsible and exclusive agents for its control, its use and expenditure. It follows that these so-called "dividends" which, as a matter of bookkeeping, were transferred on the books of this corporation and credited to the "trustee fund" in suit, not having been "sufficiently declared," and payment thereof to the stockholders in accordance with their stock ownership being expressly negatived by the terms of the resolutions creating the same, there has been in fact and in law no severance of so much of the accumulated earnings and profits of the bank embraced and covered by such resolutions from the corpus of the bank property or funds, and no part thereof has become the individual property of the stockholders. This trustee fund, as well as the property in which it has been invested, therefore, in law and in fact, has at all times constituted an asset of the bank, and is expressly subject to the bank's control.

It follows that the judgment of the trial court is correct, and is

AFFIRMED.