Argued September 17; reversed December 9, 1941

COBB *v.* GALLOWAY ET AL.

(119 P. (2d) 896)

Before KELLY, Chief Justice, and BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Ralph R. Bailey*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for appellants.

*Robert A. Leedy*, of Portland (C. C. Hall, of Portland, on the brief), for respondent.

This case is brought by the plaintiff, S. B. Cobb, a taxpayer, under the provisions of 7 O. C. L. A., § 110-1427, to review the determination of the tax commission.

The defendant commission had made assessments against the plaintiff for additional intangibles income taxes asserted to be due for the years 1935, 1936 and 1937, which the plaintiff paid under protest, and the plaintiff also, as he claims, by mistake overpaid a similar tax for the year 1938. In 1939 the plaintiff filed with the commission his petition for a refund in the amount of the alleged overpayments. After formal hearing the commission denied plaintiff's petition, and this suit was brought in the circuit court to review the administrative action. The circuit court reversed the decision of the commission and awarded to plaintiff the various refunds, from which decree the defendant commission appeals.

BRAND, J. There is little, if any, dispute as to the facts, most of which were formally stipulated. The Standard Box Factory, later renamed the Standard Box and Lumber Company, was incorporated under Oregon laws in 1896 with an authorized and issued capital stock in the amount of $20,000, divided into 200 shares of the par value of $100 each. The plaintiff, S. B. Cobb, Charles C. Woodcock and Isaac Gratton each held one-third of the capital stock. The articles of incorporation provided:

"This corporation proposes to engage in the * * * business of manufacturing lumber, boxes, and all other articles manufactured from wood, and to sell the same; to buy, sell, lease, own and mortgage real estate; to make deeds, leases and mortgages on any of its property, and to pledge the same for the security of its debts; to borrow money, and do any and all business necessary to carry out any of the purposes for which this corporation is organized."

We quote from the stipulation of the parties:

"II. In 1908 the corporation purchased for $55,000 the block west of Block 24, on East Water Street, Portland, Oregon, and in 1910 it purchased for $40,000 the block west of Block 23, on East Water Street, Portland, Oregon. In 1913 the corporation acquired an extensive tract of timber located in Washington County, Oregon. A city lot in Block 62, Portland, Oregon, was also purchased by the corporation. A plant consisting of a sawmill, planing mill and box factory was constructed by the corporation on leased land located at East Water and Ankeny Streets, Portland, Oregon.

"The sawmill, planing mill and box factory were operated by the corporation until the year 1928, when, as a result of the exhaustion of timber supply, the corporation terminated its manufacturing operations. In January, 1929, the company sold 3,600 acres of cut-over timber land, and in the following months the logging equipment and mill machinery were sold to the Alaska Junk Company. Accumulated manufactured products were also disposed of during this period. Upon the termination of the manufacturing activity, all of the corporate employees, except a small office force, were discharged.

"After the disposition of corporate assets as above described, the corporation's assets consisted principally of two waterfront blocks (block west of Block 24, on East Water Street, Portland, Oregon, and block west of Block 23, East Water Street, Portland, Oregon), a lot 25' x 200' in Block 62, Portland, Oregon, and a 160 acre tract of timber land located in Washington County, Oregon.

"At all times subsequent to the termination of the manufacturing operations in 1928, the corporation's activities have been confined to the process of disposing of its physical assets, and at no time has there been a resumption of the manufacturing operations."

"III. In 1929 the corporation erected on the block west of Block 23, East Water Street, Portland, Oregon,

a frame warehouse, which was leased to the Hudson-Duncan Company, a corporation, at a rental of $1,244 per month. The building was completed at a cost of approximately $107,000. The corporation borrowed $90,000 from the Connecticut Mutual Life Insurance Company and $15,000 from the United States National Bank of Portland, Oregon to be used in financing the constructing of the warehouse. In 1932 the block west of Block 23, East Water Street, Portland, Oregon, with the frame warehouse thereof, was sold under an executory land sale contract to the Hudson-Duncan Company. The total contract price of $247,666.66 was computed on the book value of the land, plus the depreciated cost of the building, plus interest in amount of $69,498 on the deferred payments of principal over the term of the contract. Of the total contract price $4,738.66 was paid in cash, and the remainder was to be paid in 144 monthly installments of $1,687.00 each.''

It is further stipulated that:

''Payments of principal and interest have been made and will be made by the Hudson-Duncan Company to the Standard Box and Lumber Company in the years and amounts, as appearing from the accounts of the Standard Box and Lumber Company, as follows: * * * .''

Then follows a schedule showing the payments made and to be made. The last payment to be made in completion of the contract is the sum of $8,435, to be paid in 1944.

The stipulation continues with an analysis of the corporation's earned surplus account for the years 1929 to 1938, inclusive. The analysis was summarized in the stipulation as follows:

''According to the corporation excise tax return filed by the Standard Box and Lumber Company with

the State Tax Commission for the year 1929, a copy of which marked exhibit 'G' is attached hereto and made a part of this stipulation as if incorporated herein, the earned surplus of the corporation on January 1, 1929 was $135,078.95. The earned surplus appearing on the books of the corporation on January 1, 1929 was $180,-078.95. This effective date surplus, adjusted to take into account distributions to stockholders and profits or losses, during years 1929 to 1934, inclusive, left an earned surplus on January 1, 1935 per excise tax returns of $170,731.42, and per books of $124,858.51. In 1932 the surplus account was adjusted to include a book profit of $96,319.23 realized on the sale of property to the Hudson-Duncan Company. After taking into account dividends distributed, and current operating profit or loss, incurred during the years 1935 to 1938, inclusive, the earned surplus account on January 1, 1938 showed a balance of $63,859.88. The earned surplus existing on January 1, 1929 consisted of accumulated operating profits realized during the years prior to 1929 when the corporation conducted its manufacturing activities.''

No change in stock ownership occurred until 1924. C. C. Woodcock died in 1924 and Isaac Gratton in 1925. In 1929 the Woodcock shares were purchased by the plaintiff, S. B. Cobb. It is stipulated:

''* * * In 1934, the Standard Box and Lumber Company contracted with the First National Bank, as trustee, to purchase and cancel the 66 2/3 shares originally issued to Isaac Gratton. The corporation agreed to pay for the Gratton shares by transferring to the bank, as trustee, a $3,000 mortgage on a small tract of timber land which had been sold, the north 100 feet of the block west of Block 24, East Water Street, Portland, Oregon, at an agreed value of $12,000, and a one-third interest in the receipts or proceeds to be derived from the Hudson-Duncan contract.

"The Standard Box and Lumber Company made distributions to its stockholders in amounts, and in the years, as follows:

| Year | S. B. Cobb Shares | I. Gratton Shares | Total |
|------|------|------|------|
| 1935 | $5,000.00 | $2,500.00 | $7,500.00 |
| 1936 | 5,800.00 | 2,900.00 | 8,700.00 |
| 1937 | 5,700.00 | 3,000.00 | 8,700.00 |
| 1938 | 5,000.00 | 1,200.00 | 6,200.00" |

It appears from the testimony that the corporation had an understanding with the Hudson-Duncan Company prior to the erection of the building that when completed it should be leased to that company. The building was erected between August and the end of 1929. On August 18, 1931, and while the building was still under lease to the Hudson-Duncan Company at the monthly rental of $1,244 the following resolution was adopted by vote of the stockholders of the Standard Box and Lumber Company:

"A motion was made and carried that the property of the Standard Box and Lumber Company be sold as fast as possible and that as fast as the property is sold, the money be paid to the stockholders in payment of their investment and the President is authorized to sell all the company assets and divide the proceeds and dissolve the corporation".

It may be reasonably inferred that these rentals continued to be received after the passage of the foregoing resolution until the consummation of the sale of the property to the Hudson-Duncan Company some time in 1932. The stipulation further provides:

"As the distributions were made to the First National Bank of Portland, as trustee, pursuant to the contract entered into with the Standard Box and Lumber Company in 1934, the Isaac Gratton shares were redeemed and canceled. However, all of the 66 2/3

shares originally issued to S. B. Cobb, and the 66 2/3 shares originally issued to C. C. Woodcock and purchased by S. B. Cobb in 1929, were at all times during the years 1935 to 1938, inclusive, and still are, outstanding in the name of S. B. Cobb.''

The taxes for which refunds are claimed were paid for the years in amounts and on distributions received as follows:

| "Tax Year | Amount of Distribution | Tax Paid |
|---|---|---|
| 1935 | $5,000.00 | $390.87 |
| 1936 | 5,800.00 | 464.00 |
| 1937 | 5,700.00 | 425.00 |
| 1938 | 5,000.00 | 400.00'' |

The distributions to the plaintiff were debited in reduction of earned surplus on the books of the corporation. There has been no surrender or cancellation in whole or in part of any of the plaintiff's stock. During the entire time involved the Standard Box and Lumber Company has been an existing corporation qualified under the law and its articles of incorporation to deal in real estate as well as to engage in the lumber business.

The plaintiff contends in substance that ever since January, 1929, the corporation has been in liquidation, that the company acquired all its assets solely with the view to their use in carrying on a lumber business, and that it never purchased any property for investment. The complaint even alleges that since 1929 the corporation "has done nothing with a view to realizing a profit". This allegation is not sustained by the evidence. The complaint itself adds:

"* * * that any profits accruing to said corporation since 1928 have been purely incidental to its program of liquidation and have consisted almost exclusively of interest received upon the sale contract hereinafter referred to as the Hudson-Duncan contract.''

We must assume that both the lease and the install-ment contract with the Hudson-Duncan Company were, like the dealings of all business corporations, carried out with the purpose of avoiding loss and making a profit if possible. The plaintiff did testify that he had no intention of engaging in new business and that he planned to dissolve the corporation just as soon as he could dispose of the assets. Concerning the time for possible dissolution of the corporation plaintiff testi-fied as follows:

"Q. * * * What is the earliest date as to which there could be a dissolution under the present circum-stances?

A. Oh, it might be one year and it might be three.

Q. When does the Hudson-Duncan contract expire?

A. Oh, that? Yes, referring to that, June, '44.

Q. Then what is the earliest date as of which this corporation could be dissolved under the present cir-cumstances.

A. At that time it could be.

Q. In the year 1944?

A. It could be, yes, sir. You see, I have to give a deed there and after the deed is gone, we could divide the property up so far as that goes among the stock-holders."

Again he testified as follows:

"Q. And has the Standard Box & Lumber Com-pany made any effort to dispose of that portion of a block?

A. Oh, yes, we have offered to lease, to build, or to sell on any terms that anybody would within reason—that would be desired by the purchaser."

Again:

"Q. Do you have any plans at the present time to improve other properties of the corporation?

A. I have a sign posted there now on the building that this property is for sale, or will build to suit a good tenant.

Q. If a prospective purchaser were to be willing to buy in the event the corporation were willing to improve, then the corporation would improve the property?

A. If it became necessary to do that, yes, sir.

Q. Have you any way of knowing whether or not the corporation will in the future undertake such improvements?

A. No, I can't tell."

Further circumstances throw doubt upon the plaintiff's contention that it has been in liquidation ever since 1929. The stockholders' resolution quoted supra was passed while the corporation was receiving $1,244 a month rental, with a $247,666 installment sale in contemplation. The corporation itself was bound by a contract with the trustees of the Gratton Estate, which could not be fully performed until 1944. Concerning that contract the plaintiff said:

"A. Well, the contract shows that for every $4,000 of dividends that is paid to the Gratton estate they turn back to the Standard Box & Lumber Company $5,000 worth or five shares of the stock of the Standard Box & Lumber Company.

\* &ast; &ast; &ast; &ast;

It was figured that when the total contract under the Hudson-Duncan contract had been completed that that would have returned all of the stock held by the Gratton estate."

Again the corporation had issued a bond for a deed to be delivered in 1944. The stockholders' resolution, quoted supra, merely authorized but did not direct the president to dissolve the corporation. Since for all practical purposes the plaintiff had complete control

of the corporation there was nothing to prevent it from constructing another equally substantial building on its remaining property and renting it indefinitely, as the quoted testimony indicates the corporation would willingly do.

The provisions of the Intangibles Income Tax Law so far as applicable to the case at bar are as follows:

"A tax hereby is imposed upon every resident individual and corporation, which tax shall be levied, collected and paid annually at the rate of 8 per cent with respect to the taxpayer's net income as herein defined." 7 O. C. L. A., § 110-1405.

"The term 'net income' means the gross income of the taxpayer from intangibles less the deductions allowed by this act." 7 O. C. L. A., § 110-1404.

"(1) The term 'gross income' includes all interest and dividends derived from intangibles as defined in section 110-1402, * * *." 7 O. C. L. A., § 110-1403.

"* * * (9) The word 'intangibles' means and includes money at interest * * * and all shares of stock in corporations, joint stock companies or associations." 7 O. C. L. A., § 110-1402, sub. (9).

■ From the foregoing it appears that a resident individual is taxable on his net income in the form of "all * * * dividends" derived from "all shares of stock in corporations."

Assuming for the purpose of this discussion that the corporation went into liquidation in 1929 and has been liquidating ever since and will continue to liquidate for an indefinite period in the future (as assumption requiring a large degree of credulity) we will consider first the contention of the defendant commission that the distributions for the years 1935 to 1938 inclusive constituted taxable income. The commission does not contend that all distributions by a corporation in liquidation are taxable as dividends. It concedes that

if the corporation had no accumulated earned surplus or current profits and if distributions were made out of corporate capital assets they would not be taxable as dividends. It also concedes that:

"if distributions were made as payments in exchange for stock actually canceled or redeemed there would be a 'sale or other disposition of property' within the purview of section 69-1508, Oregon Code 1935 Supplement (personal income tax law), and such payments could be taxed as income only to the extent of gain realized, if any, in excess of the adjusted cost basis in the stock."

■ The commission does contend that the term "all * * * dividends" at least "includes *any distribution by an existing corporation out of earned surplus where the distribution is not paid in exchange for capital stock actually canceled or redeemed.*" With this proposition as applied to the case at bar we agree. Whether the term should be given a wider scope need not be here determined.

Upon this appeal two propositions are presented by the plaintiff taxpayer. He first asserts that:

"Corporate Distributions in Liquidation Are Not 'Dividends' Within the Meaning of the Oregon Intangibles Income Tax Law in Effect From 1935 Through 1938."

■ While this may be true concerning some distributions in liquidation, as the commission admits, the general assertion is too broad for our acceptance. In a brief largely devoted to *argumentum ad hominem* and which is therefore less helpful than it would otherwise be, the plaintiff discusses the general subject of "distributions in liquidation." This phrase does not appear in the Oregon Intangibles Law of 1931. It was introduced into our system by the personal income tax law of 1939. 7 O. C. L. A., § 110-1602. Decisions under the phrase-

ology of the latter act and of similar state and federal statutes cannot be determinative in the case at bar. The term "dividends" is not defined in the Intangibles Act of 1931 and we must look elsewhere for its meaning. The fact that it is defined in the 1939 act suggests an intent to change rather than to codify the earlier meaning. A similar conclusion was reached in the case of *Lynch v. Hornby*, 247 U. S. 339, at 345-6, 62 L. Ed. 1149, 38 S. Ct. 543 (1917). Ordinarily distributions out of the earnings and profits of a corporation and divided among the stockholders according to their respective interests as represented by the shares of outstanding capital stock are "dividends." 18 C. J. S. 1094, § 458; 7 Thompson on Corporations, (3rd Ed.) § 5260; *State, ex rel. Sorensen, v. Nebraska State Bank*, 123 Neb. 289, 242 N. W. 613 (1932); *Brown v. Luce Mfg. Co.*, 231 Mo. App. 259, 96 S. W. (2d) 1098 (1936); *Petty v. Hagan*, 205 Ky. 264, 265 S. W. 787 (1924); *In re Romney's Estate*, 60 Utah 173, 207 P. 139 (1922).

The following authorities support the view that the distributions to plaintiff out of earnings and profits even if made as a part of a prolonged and continued liquidation would constitute dividends taxable under the Intangibles Law: *Gable v. South Carolina Tax Commission*, 189 S. C. 346, 1 S. E. (2d) 244 (1938); *Falk v. Wisconsin Tax Commission*, 218 Wis. 130, 259 N. W. 624 (1935). See also *Moore v. Tax Commissioner*, 237 Mass. 574, 130 N. E. 59 (1921), and the following cases decided under federal statutes differing slightly from our own: *Cohen v. Commissioner*, 20 B. T. A. 647 (1930); *Pearson v. Commissioner*, 16 B. T. A. 1405 (1929); *Darrow v. Commissioner*, 8 B. T. A. 276 (1927); *Appeal of Dobson*, 1 B. T. A. 1082 (1925); *McCaughn v. McCahan*, 39 F. (2d) 3 (1930).

The case of *Lynch v. Hornby*, supra, arose under the federal statute of 1913 which imposed a tax upon net income and provided that net income shall include dividends. The word "dividends" was not defined. The corporation in 1914 was operating in the lumber business, having acquired undivided profits to the extent of several million dollars. In 1914 the corporation distributed to the stockholders $410,000 which was derived from the conversion into money of property that it owned or in which it had an interest on March 1, 1913 (the effective date of the statute). The court said:

"In the present case there was no winding up or liquidation of the Cloquet Lumber Company, nor any surrender of Hornby's stock. * * * The operations of this company in the year 1914 were, according to the facts pleaded, of a nature essentially like those in which it had been engaged for more than a quarter of a century. The fact that they resulted in converting into money, and thus setting free for distribution as dividends a part of its surplus assets accumulated prior to March 1, 1913, does not render Hornby's share of those dividends any the less a part of his income within the true intent and meaning of the act, * * *.

"Hence we construe the provision of the act that 'the net income of a taxable person shall include gains, profits, and income derived from * * * interest, rent, dividends, * * * or gains or profits and income derived from any source whatever' as including (for the purposes of the additional tax) all dividends declared and paid in the ordinary course of business by a corporation to its stockholders after the taking effect of the act (March 1, 1913), whether from current earnings, or from the accumulated surplus made up of past earnings or increase in value of corporate assets, notwithstanding it accrued to the corporation in whole or in part prior to March 1, 1913. In short, the word 'dividends' was employed in the act as descriptive of one kind of gain to the individual stockholder; dividends being treated as the tangible and recurrent returns upon his

stock, analogous to the interest and rent received upon other forms of invested capital."

The distributions were held to be part of the taxable income. Upon the same day that the court decided *Lynch v. Hornby*, supra, it also rendered its opinion in the case of *Lynch v. Turrish*, 247 U. S. 221, 62 L. Ed. 1087, 38 S. Ct. 537 (1918). In 1914 the plaintiff received a distribution from the Payette Lumber & Mfg. Co. in the sum of $79,975. Owing to increase in value of its properties the plaintiff's stock had doubled in value. In December, 1913, the Payette Company sold all of its assets for cash which it held in double the amount in par value of its stock. The cash was distributed to the stockholders upon the surrender of their certificates and the company went out of business. It was held that the distribution was not income within the meaning of the act of 1913. But the court said:

"And in determining the application of the statute to Turrish we must keep in mind that on the admitted facts the distribution received by him from the Payette Company manifestly was a single and final dividend in liquidation of the entire assets and business of the company, a return to him of the value of his stock upon the surrender of his entire interest in the company, and at a price that represented its intrinsic value at and before March 1, 1913, when the act took effect."

It was upon this ground that the Turrish case was expressly distinguished in the Hornby case, supra.

Neither of the last cited cases are directly in point. The case at bar more closely resembles *Lynch v. Hornby*, supra. The Turrish case is not in conflict with the theory of the Tax Commission in the instant case for the reason that the dividend to Turrish was a single and final dividend in liquidation of the entire assets and upon surrender of the stockholders' entire interest in the company.

It remains to consider the case of *Kelly v. Galloway*, 156 Or. 301, 66 P. (2d) 272, 68 P. (2d) 474 (1937). Both parties rely upon this case. The plaintiff Kelly brought suit against the Tax Commission to secure the cancellation of a tax assessed by it under the Intangibles Income Act of 1931. The plaintiff was the owner of stock in the Oregon Land and Livestock Company. In 1902 the corporation had acquired large tracts of timber land which had been supplemented by later small acquisitions.

"* * * Apart from the purchase of these properties the corporation's sole activities have consisted of maintaining its existence, paying its taxes, protecting its lands, selling portions thereof as opportunities presented themselves, and distributing the proceeds to its stockholders. Prior to December 31, 1929, by common consent of all its stockholders and directors, it was agreed that the corporation 'should engage in no business except such as was incidental to the protection of its properties and the sale and disposal thereof, and that as said properties were sold the proceeds thereof should be distributed among its members, and that whenever said assets should be completely disposed of said corporation should be dissolved.' "

It will be noticed that the corporation's sole activities were substantially similar to the activities of the Standard Box and Lumber Company subsequent to 1928 and that the agreement by common consent of the stockholders was similar to the resolution of the stockholders in the case at bar. Prior to January 1, 1930, the corporation in the Kelly case had sold and disposed of over 98 per cent of its holdings "and to the extent that the proceeds of said sale had been received, has distributed the same among its stockholders." In 1931 the corporation received $114,495.29 principal and $15,180 interest from its contract purchasers, and in that year it distributed in dividends to its stockholders

all principal and interest money received since December 31, 1929, which had not theretofore been distributed. Out of the distributions the plaintiff received $15,025, representing his part of the principal received by the corporation. He reported to the commission the share of interest money received but not the $15,025. The principal contention of the plaintiff in the Kelly case was that a surplus accumulated by a corporation prior to the enactment of the statute ought to be deemed capital and therefore a nontaxable distribution and not an ordinary dividend. At the end of 1930 the company had a surplus of $1,792,477.57. The distribution to the stockholder was held to constitute a dividend and to be taxable as income. Thus there can be nothing in the actual point decided which could be inconsistent with a similar decision here. The reasoning of the court leads to a similar conclusion. In the Kelly case the sole activity of the corporation was its dealings in real estate. The same has been true of the Standard Box and Lumber Company ever since 1929, the only distinction being that prior to 1929 the latter company had been chiefly engaged in the lumber business. In both cases the companies derived rent from land after as well as before the time when the alleged liquidation began. In the Kelly case the corporate surplus was largely due to appreciation in the values of land in which its capital had been invested, whereas in the case at bar the surplus was largely profit earned in production and more obviously to be classed as income. In both cases the distribution was made out of surplus. In the Kelly case the corporation had disposed of 98 per cent of its holdings prior to the date of the distribution in issue. In the case at bar the corporation had and still retains title to the south half of the block west of Block 24. This block had been purchased for

$55,000. It also had and still has 160 acres of timber land of unspecified value and a lot 25 x 200 for which it had paid $9,000. Obviously the percentage of the total property of the Standard Box and Lumber Company which was undisposed of either by executory contract or otherwise at the time of the distributions to the plaintiff was much larger than the undisposed 2 per cent in the Kelly case. There was no disclosure of intent or willingness to engage in future construction to facilitate leasing of property in the Kelly case but such willingness was affirmatively expressed by the plaintiff here. Proceeding from the facts and the actual decision to the language of the opinion, we fail to find any substantial support for the plaintiff's contention in the case at bar. The court asserts (with an exception not material here) that a dividend declared and paid by a corporation in the ordinary course of its affairs while it is pursuing the business activities for which it was formed is deemed a part of the stockholder's income, but the court adds:

"* * * If, however, the corporation has abandoned its pursuits and has sold its property preparatory to terminating its existence, the sum which the stockholder receives upon surrender of his stock certificate will not be deemed a dividend but will be regarded as the sale price of his stock."

In the case at bar the corporation has not abandoned its pursuits, but only one of them. A substantial portion of its property is unsold and there was no surrender by the stockholder of his certificate or any part thereof. The plaintiff quotes from the opinion in the Kelly case the following:

"* * * As ordinarily understood, a dividend is a dividend even though it is paid out of a surplus; likewise, as ordinarily understood, a liquidating dividend

which is paid, incidental to the conclusion of the corporation's life, is not a dividend; * * *."

from which the plaintiff draws an inference that the distribution to him was not taxable under the Intangibles Act. A fuller quotation from the opinion will throw light upon the true meaning of the court:

"* * * Our statute interpreted in the light of the above decisions employs the term 'dividend' in its ordinary and not in its technical sense. It does not expressly exclude a dividend paid out of a surplus. As ordinarily understood, a dividend is a dividend even though it is paid out of a surplus; likewise, as ordinarily understood, a liquidating dividend which is paid, incidental to the conclusion of the corporation's life, is not a dividend; it may be merely a return of capital."

■ We find little benefit in discussing whether "liquidating dividends" were taxable under the Intangibles Act. The term is too broad and too indefinite. Previous to 1939 when the term received statutory definition it might have included one of many contemplated annual distributions of surplus or, on the other hand, a single final distribution of capital with no surplus involved. Thus some distributions within the broad meaning of the term might be taxable as dividends while others clearly would not. Such was apparently the meaning of the court in the Kelly case when it said:

"* * * a liquidating dividend which is paid, incidental to the conclusion of the corporation's life, is not a dividend; *it may be merely a return of capital.*" (Italics ours.)

Again the court refers to facts in the Kelly case which strongly resembled those in the case at bar

"* * * it will be necessary to execute and deliver deeds to the purchasers when they have completed payment of the purchase price. So long as land remains

unsold, deeds remain unexecuted and contracts remain unperformed, the time has not been reached when liquidation is possible. * * * Most corporations expect to replace the reduced surplus with new money derived from further earnings, but the mere fact that a corporation like this one does not expect to do so does not transform the dividend paid out of surplus into something else. Liquidation will be reached when the surplus is gone or the corporation proceeds to terminate its existence.''

■ It is true that some emphasis was laid by the court in the Kelly case upon the fact that there was no stockholders' resolution favoring dissolution after distribution of all assets and it is also true that there was a resolution authorizing though not requiring dissolution in the case at bar. But such a resolution while entitled to consideration does not conclusively establish that the corporation was in liquidation.

''* * * Liquidation is not a technical status which can be assumed or discarded at will by a corporation by the adoption of a resolution by its stockholders, but an existing condition brought about by affirmative action, the normal and necessary result of which is the winding up of the corporate business.'' *W. E. Guild, et al. v. Commissioner of Internal Revenue*, 19 B. T. A. 1186, 1204 (1930).

■ Although the Standard Box and Lumber Company had terminated its principal business it was still a going concern engaged in the business expressly authorized by its articles of incorporation. Its distributions were from surplus; its original capital was unimpaired and a large surplus remained; its purported liquidation has continued for 12 years and may continue for many years to come. There has been no cancellation of any part of plaintiff's stock in exchange for dividends and the company contemplates further use and

investment of its funds if such investment shall facilitate the sale of its real estate.

In the absence of any statute defining dividends we hold that the distributions to plaintiff for the years 1935 to 1938, inclusive, constituted dividends taxable under the Intangibles Act. Under the doctrine of *Kelly v. Galloway*, supra, and under the facts heretofore stated, corporate dissolution then was and now is a remote contingency, and the company is not in liquidation in any sense which could exempt it from the burden of this tax. See *Perry v. Commissioner*, 9 B. T. A. 796 (1927).

The plaintiff's second proposition to which we referred is merely an attempted application of his first proposition to the facts of the instant case. It is stated in plaintiff's brief as follows

"The Distributions in Question in the Instant Case Were Distributions in Liquidation and Therefore Were not 'Dividends.' "

What we have already said disposes of plaintiff's proposition No. 2.

The cases of *Lynch v. Turrish*, supra; *Gossett v. Commissioner*, 59 F. (2d) 365 (1932), and *Tootle v. Commissioner*, 58 F. (2d) 576 (1932), cited by the plaintiff, are each discussed in *Kelly v. Galloway*, supra, and are there shown to be distinguishable both from the Kelly case and from the case at bar. The only other cases cited by plaintiff are *Bacharach v. Commissioner*, 29 B. T. A. 282 (1933); *Frelmort Realty Corporation v. Commissioner*, 29 B. T. A. 181 (1933), and *Guild v. Commissioner*, supra. The decisions in those cases were under federal statutes differing materially from the Oregon Intangibles Act and they are not decisive here.

The decree of the circuit court is reversed and the suit is dismissed. Neither party will recover costs.