Argued May 8, modified and remanded September 6, 1956

STIPE ET AL *v.* FIRST NATIONAL BANK OF
PORTLAND ET AL
301 P. 2d 175

*P. A. Schwabe*, Portland, argued the cause for appellants. On the brief were Maurice D. Sussman and Haas & Schwabe for First National Bank of Portland, and DeArmond, Goodrich, Foley & Gray for A. C. Goodrich, guardian ad litem for appellants Harry Pierce Beach, Sharon Olsen, Allen Stipe, Patricia Stipe, and James R. Stipe.

*Owen M. Panner*, Bend, argued the cause for respondents. On the brief were McKay & Panner.

Before WARNER, Chief Justice, and TOOZE, LUSK, BRAND and PERRY, Justices.

WARNER, C. J.

This is a suit brought to compel the First National Bank of Portland, as Executor of the Estate of Arthur Stipe, deceased, to deliver to plaintiffs certain shares of the capital stock of the Bend Furniture Company, an Oregon corporation, hereinafter referred to as the "Company", and for a further decree declaring plaintiffs to be equal owners of said stock free and clear of any interest of the defendants herein. From a judgment in favor of plaintiffs in accordance with the prayer of their complaint, the bank and other defendants appeal.

The plaintiffs, Arthur C. (Bud) Stipe, Maxine Jean Fisher and Phyllis Mary Olsen, are the children of the late Arthur Stipe and of his former wife, Nettie Stipe. Because of the similarity of the father's name with that of his son, we shall hereafter refer to Mr. Stipe, deceased, as "Arthur" and to his son when necessary as "Bud", a name by which he was commonly known.

Arthur died testate November 22, 1953, leaving a substantial estate. He nominated the defendant First National Bank of Portland, hereinafter called the "Bank", as executor of his estate. In this capacity the the Bank is now in possession of the shares of company stock which are the subject matter of this litigation.

The five minor defendants, Harry Pierce Beach, Sharon Olsen, Allen Stipe, Patricia Stipe and James R. Stipe, are children of one or the other of the plaintiffs and hence grandchildren of Arthur Stipe and Nettie Stipe and legatees and devisees under their grandfather's last will and testament.

The defendants Evelyn M. Mackey, Ella Russell and Nettie Stipe, all of whom defaulted below, are likewise beneficiaries under Arthur's will.

It is the contention of plaintiffs that in 1934 Arthur and Nettie Stipe entered into a property settlement agreement as an incident to their then pending suit for divorce; that as a part of this settlement, Arthur then and there executed a trust declaration whereby he transferred to Frank S. McGarvey, President of the Lumbermen's National Bank of Bend, Oregon, 105 shares of the capital stock of the Bend Furniture Company, in trust, for the use and benefit of his three children, who are the plaintiffs herein.

The plaintiffs represent that their Exhibit No. 2 is an exact copy of the original trust declaration exe-

cuted by their father in 1934. The exhibit tendered and admitted is a typewritten copy upon which Arthur's attorney, Jay H. Upton, now deceased, had inserted in pencil the signatures and all other matter appearing in longhand on the original document and is as follows:

### "TRUST AGREEMENT

"KNOW ALL MEN BY THESE PRESENTS, that I, Arthur Stipe, the owner of 105 shares of the capital stock of the Bend Furniture Company, a corporation, do hereby sell, assign, transfer and set over unto Frank S. McGarvey, President of the Lumbermens National Bank of Bend, Oregon, and to his successor in such office, as Trustee, 105 shares of the capital stock of the Bend Furniture Company, a corporation, for the use and benefit of the three minor children of Nettie Stipe and Arthur Stipe, viz: Maxine Jean Stipe, now aged 19 years; Arthur Cole Stipe, now aged 16 years; and Phyllis Mary Stipe, now aged 13 years.

"TO HAVE AND TO HOLD THE SAME in Trust for the use and benefit of the said Maxine Jean Stipe, Arthur Cole Stipe, and Phyllis Mary Stipe, in equal portions, under the following terms and conditions, to wit:

"Upon the death of this assignor, Arthur Stipe, the said Trustee shall surrender the certificate of stock for the 105 shares to said Corporation and shall cause to be issued to said three children a Certificate of stock of 35 shares each, but if at said time, any of said children have died and have left no children, then the 105 shares shall be divided to the one or more of said three children remaining alive, but if either of said children have died leaving children of their own, then the portion which said child would have received, if alive, shall become the property of the children of said deceased child, and said grandchildren of the said Arthur Stipe, provided their parent is dead, shall be entitled to take the number of shares of stock which their

parent would have received had he or she been alive at the time of the death of the said Arthur Stipe, and this transfer is subject to the further reservation and condition that during the lifetime of the said Arthur Stipe, he shall be entitled to any and all dividends that may accrue or be declared upon the same, and that said beneficiaries shall have no right to receive any dividends from the earnings of said stock during the life of the said Arthur Stipe, and the said Arthur Stipe also reserves the right to vote said stock and all thereof at any and all meetings of the stockholders of said corporation, and that said Trustee has, upon the execution of this Assignment, executed and delivered to the said Arthur Stipe an irrevocable Power of Attorney authorizing and giving to the said Arthur Stipe the sole right to vote said stock at any and all meetings of the stockholders of said corporation.

"In event the said Bend Furniture Company, a corporation, should sell a major part of its holdings or assets and a capital dividend should be declared for that or any other reason, then the proceeds of said capital dividend shall be paid to the Trustee and the said Trustee shall hold and invest the same paying the income therefrom to the said Arthur Stipe, during his lifetime, and at his death, pay the proceeds of said capital dividend or dividends to the beneficiaries as their interest may appear.

"IN WITNESS WHEREOF, the said Arthur Stipe has hereunto set his hand and affixed his seal this 27th day of June, 1934.

"[Signed] Arthur Stipe

STATE OF OREGON⎫
County of Deschutes ⎬ss.

"BE IT REMEMBERED, that on this 27th day of June, 1934, before me, the undersigned, a Notary Public in and for said County and State, personally appeared the within named Arthur

Stipe, who is known to me to be the identical individual described in and who executed the within instrument and acknowledged to me that he executed the same freely and voluntarily.

"IN WITNESS WHEREOF, I have hereunto set my hand and official seal the day and year last above written.

"[Signed] Jay H. Upton
"Notary Public for Oregon

"My Commission expires: Mar. 19, 1937"

Plaintiffs further claim that since 1934 the original trust res of 105 shares has been increased by 674.94 shares because of certain stock dividends declared thereon. They argue that as beneficiaries of the trust, they are the owners in equal amounts of the 779.94 shares now held by the Bank and ever since their father's death have been entitled to the possession of said shares.

At all times subsequent to June 27, 1934, to Arthur's death, he was a dominant figure in the Company's business.

The Company's stock certificate books show that two days after the alleged trust agreement was made, i.e., June 29, 1934, Arthur transferred 105 shares of Company stock to "F. S. McGarvey, President, Lumbermen's National Bank, Trustee". This transfer was evidenced by stock certificate No. 20. The same record further shows that on December 30, 1936, Certificate No. 20 was transferred by McGarvey, as said trustee, to "A. Stipe". Stipe in turn had certificate No. 22 issued to himself for the 105 shares. Certificate No. 22 was in Arthur's possession at the time of his death as were certificates evidencing ownership of 674.94 additional shares which had been issued by the

Company at various times as stock and optional dividends on the original 105 shares.

If Arthur did in fact create a trust in 1934 as is claimed by plaintiffs, then it is obvious that in order to legally effectuate a return of the 105 shares to himself in December, 1936, the decedent had to revoke the trust agreement, if it was in fact revocable. On the other hand, if it was not revocable, then the trust corpus and all accruals thereon are still impressed with the terms of the trust and must be delivered by the Bank to the plaintiffs.

The appealing defendants contend:

(1) That there is no evidence that the alleged trust agreement had been effectively executed and performed. This they premise upon a claim of improper admission of secondary evidence in the absence of the production of the original of the trust instrument and a representation that Arthur never parted with the ownership of the 105 shares mentioned in the trust agreement; and

(2) That if the trust agreement is held to have been effectively executed, there is no evidence that it continued in effect to and was in force at the time of Arthur's death in November, 1953. This view has its origin in defendants' claim that the trust was revocable at will and the possession by Arthur of the 105 shares at the time of his death was the result of such a revocation; and

(3) That if it be found that the trust was in full force and effect at the time of Arthur's death, it applied to no more than the original 105 shares in the Company. The foundation for this concept is the language of the trust agreement reserving to Arthur during his lifetime ''any and all dividends'' that accrued thereon. Appellant argues that the language includes all stock dividends as well as cash dividends; and

(4) That the alleged trust agreement was void because of an imperfectly attempted testamentary disposition of the 105 shares.

From this diversity of contentions on the part of the respective parties we derive two principal questions requiring answer: First, did Arthur Stipe during his lifetime execute an irrevocable trust for the benefit of plaintiffs and thereafter transfer to the nominated trustees 105 shares of the Company stock as the trust res, and, second, are the 674.94 shares received by the trustor during his lifetime as stock and optional dividends accruing on the 105 shares an addition to the trust res, or do they properly belong to Arthur's estate?

At the commencement of the trial plaintiffs offered into evidence the document which was subsequently received as Exhibit A. Defendants objected to the admission of this conformed copy of the trust agreement, relying on *Jones v. Teller*, 65 Or 328, 333, 133 P2d 354, where we said:

"* * * before a party can give secondary evidence of the contents of a writing, he must show that he cannot produce the original in a reasonable time by the exercise of reasonable diligence." (Citing numerous cases.)

All parties agree that the foregoing is a correct statement of the controlling rule, but plaintiffs argue, and we think correctly, that their position is to be measured and determined by what constitutes reasonable effort to produce the original, as declared in *Wiseman v. N.P.R.R. Co.*, 20 Or 425, 26 P 272, 23 Am St Rep 135. There we find, at page 428:

"No precise rule has been or can be laid down as to what shall be considered a reasonable effort (to produce the original), but the party alleging the

loss or destruction of the document is expected to show 'that he has in good faith exhausted in a reasonable degree all the sources of information and means of discovery which the nature of the case would naturally suggest, and which were accessible to him * * * From the nature of the subject there is some difficulty in laying down a general rule defining the extent and vigilance of the search which a party must make before the court may conclude that the paper is destroyed or lost. As a general rule, however, we may say that when, from the ownership, nature or object of a paper, it has properly a particular place of deposit, or where from the evidence it is shown to have been in a particular place or in particular hands, then that place must be searched by the witness proving the loss, or the person produced into whose hands it has been traced. The extent of the search to be made in such place or by such person must depend in a great degree upon the circumstances. Ordinarily, it is not sufficient that the paper is not found in its usual place of deposit, but all papers in the office or place should be examined. On the whole, the court must be satisfied that the paper is destroyed and cannot be found. It is true, the party need not search every possible place where it might be found, for then the search might be interminable, but he must search every place where there is a reasonable possibility where it might be found.' This rule is founded on reason and justice, and to require any less degree of diligence would be to defeat the object of reducing agreements to writing."

■ We find ourselves in accord with Professor Wigmore, who not only echoes the position of this court as stated in Wiseman, supra, but also contends that the ultimate determination of the sufficiency of the search should be left entirely to the trial court's discretion.

"The essential principle of preferred evidence is that it is to be procured and offered if it can

be had. * * * That thought dominates both the present rule preferring production of the document itself and the ensuing class of rules preferring one kind of witness to another kind * * *. The thought is here not that a certain kind of evidence is absolutely necessary, but that a certain kind is to be used if it is available. If it is not available, then it is not insisted upon. * * *

"The question thus resolves itself into an inquiry as to the sufficiency of the search; * * * . * * * it should be plainly understood * * * that there is not and cannot be any universal or fixed rule to test the sufficiency of the search for a document alleged to be lost. The inquiry must depend entirely on the circumstances of the case. * * * This general principle of relativity, that the sufficiency of the search depends upon the circumstances of the case, is sometimes expressed in the form of a standard of diligence; the search, it is said, must appear to have been made with such diligence as was reasonable upon all the facts of the case in hand. The party proving the document must have used all reasonable means to obtain the original. *It follows, properly, that the determination of the sufficiency of the search and in general of the proof of the fact of loss should be left entirely to the trial court's discretion."* (Emphasis added.) 4 Wigmore, Evidence (3d ed) 1194, § 1192. Also see 32 CJS 772, Evidence § 842(a) and § 842(b) 774; *Peters v. Queen City Ins. Co.,* 63 Or 382, 391, 126 P 1005.

A summary of the evidence which the respondents depend upon to warrant the admission of Exhibit No. 2 as such secondary evidence is as follows:

The provision for the benefit of the plaintiffs reflected by the trust agreement executed the same date as the decree was a part of the property settlement made by their parents in the divorce suit. The copy here employed as Exhibit No. 2 was presented to Mrs.

Stipe by Judge Wallace, now deceased, her attorney in that suit, during the course of that proceeding. He then informed her that it was handed to him by her husband's attorney, Mr. Upton. Mrs. Stipe identified the handwritten inserts in the conformed carbon copy as being in the handwriting of Mr. Upton. The copy introduced here has been in Mrs. Stipe's possession ever since she received it in court from her attorney. It is also the testimony of Mrs. Stipe and her daughter, the plaintiff Phyllis Stipe Fisher, that they both saw the original of the document at the time of the divorce trial. So far as plaintiffs are concerned, nothing was known about the whereabouts of the original until 1942. At that time Mrs. Fisher shared a safety deposit box with her father in one of the local banks, and it was then that she again saw the original of the trust declaration. Her last view of it was in 1944 when she removed her possessions from the box previously maintained for the joint use of the father and daughter.

The plaintiff, Bud Stipe, testified that he had no knowledge of the existence of a trust agreement prior to his father's demise. He stated that his first awareness of the existence of the trust came at least a month or so after his father's death when his mother sent him the conformed copy of the trust declaration.

According to the testimony, Arthur was the last known person to have possession of the original instrument when it reposed in his safety deposit box. If he continued to retain possession up to the time of his death, the presumption is that it passed to the defendant Bank in its capacity as Arthur's executor.

But the appealing defendants themselves exonerate the plaintiffs from the necessity for a further

search for the missing original trust agreement when they say, as they do in their brief:

"Since the original instrument, if executed, could not be found after the death of Arthur Stipe, it must be presumed (as in the case of a will not found after death) that he revoked the trust and destroyed the document."

This is precisely in accord with the position taken by plaintiffs during the course of the trial, i.e., that the trustor Arthur Stipe sought to revoke the trust when he reacquired stock certificate No. 20 from Mr. McGarvey, the trustee.

Notwithstanding the foregoing admission, counsel for appellants indulge in affectations of surprise because plaintiffs made no demand upon the executor Bank to produce the original agreement last accounted for in possession of the executor's decedent. Such would, indeed, seem a vain gesture on the part of plaintiffs, not alone because of the foregoing concession made by the appealing defendants, but also because of the status of the pleadings which in and of themselves exonerate the plaintiffs from pressing such inquiry.

A copy of the trust agreement was attachd to plaintiffs' complaint as Exhibit A. We have held that when it is apparent from the face of the pleadings that a writing in the custody of one party will be required at the trial of a cause by the other party, the pleadings themselves are sufficient notice to the adverse party to produce the document at the trial, and, if he fails to do so, secondary evidence as to its contents is admissible. *Peters v. Queen City Ins. Co.,* 63 Or 382, 390, 126 P 1005; *Michelin Tire Co. v. Williams,* 135 Or 158, 159, 293 P 938; 32 CJS 778, Evidence § 844; 1 Jones,

Evidence (4th ed) 437, § 224. The defendants here by their answer disclaimed any knowledge or information of the trust agreement pleaded as Exhibit A by the plaintiffs. That circumstance alone afforded an additional reason relieving the plaintiffs from the necessity of a demand on defendants for the original. *Michelin Tire Co. v. Williams,* supra, at p. 159.

■ Under the circumstances outlined above, we are of the opinion that the trial judge did not abuse his discretion when he determined that plaintiffs might introduce Exhibit No. 2 in lieu of the original and as a sufficient compliance with ORS 41.640(1)(b).

■ The briefs of appellants and respondents are replete with extended discussions concerning the presence or absence of consideration for the trust agreement. We deem their respective representations as irrelevant to the issues presented for the reason that an owner of property can create a trust of property by transferring it to another person in trust although there is no consideration other than the transfer of the property. 1 Restatement 98, Trusts § 29; 1 Scott, Trusts, 178, § 29; Newman, Trust, 59; 89 CJS 747, Trusts § 28; 54 Am Jur 51, Trusts § 41; Bogert, Trusts, 254 § 202.

■ This court has long been committed to the rule that in order to establish a voluntary trust with a third person there must be a delivery of the trust property to the trustee or a document of transfer. *Winters v. Winters,* 165 Or 659, 665, 109 P2d 857; *Windle, Adm., v. Flinn,* 196 Or 654, 678, 251 P2d 136.

We are satisfied that such a delivery was made and that McGarvey took possession of the trust res as trustee. We note again that two days after signing the trust agreement Arthur caused a new certificate

No. 20 to be issued to "F. S. McGarvey, President, Lumbermen's National Bank, Trustee", for the 105 contested shares. The trustee's acceptance is attested by the fact that McGarvey, on December 30, 1936, endorsed his interest in stock certificate No. 20 to "A. Stipe" by employing the same description of trusteeship appearing on the certificate as issued. Thus the transfer of the settlor's interest to the trustee is evident.

The appealing defendants urge that, assuming that a valid trust was created, "the same was revocable at will". This appears to be predicated on the specious argument that because the trust was voluntary and without support of consideration, there was ipso facto reserved to the trustor the right to revoke it at will. Appellants' argument in support of this position is exceedingly vague and nebulous. No authorities are marshalled to give credence to appellants' theory of revocability. That the argument is based on the absence of consideration we garner piecemeal from the employment of such suggestive phrases as: "The above quoted testimony [of Mrs. Stipe on the divorce trial relating to the property settlement agreement] shows that the provision in respect to the 105 shares was a purely voluntary act on Arthur's part, *there was no quid pro quo,* it was in no way connected with Nettie's [Mrs. Stipe] divorce settlement with Arthur." (Emphasis ours.)

But whatever appellants' theory of revocability may be, it cannot successfully rest upon the absence of consideration.

We have already observed that consideration is not necessary to a fully executed trust. The situation now presented by appellants finds complete answer in

1 Scott, Trusts, 179, § 29. That distinguished author says:

"Where the owner of property transfers it in trust, as well as where he declares himself trustee of the property, the trust is irrevocable, unless the settlor reserves the power of revocation. *This is true even though, as is usually the case, the settlor received no consideration for the creation of the trust.*" (Emphasis ours.)

The rule enunciated by Scott to the effect that a trust is irrevocable unless the settlor reserves the power of revocation is the majority rule. See also 3 Scott, Trusts, 1795, § 330; 2 Restatement, Trusts, § 330(2); 54 Am Jur 79, Trusts § 77; 89 CJS 898-901, Trusts § 88.

This court has only once before addressed itself to the subject of the power to revoke trusts. *Allen v. Hendrick,* 104 Or 202, 224, 206 P 733. But we have not heretofore passed directly or indirectly upon the proposition here raised: whether a trustor can revoke a trust without the consent of the beneficiaries in the absence of a reserved power authorizing such action. We therefore adopt with approval the statement found in 4 Bogert, Trusts and Trustees, 429, § 993, as our concept of the true rule:

"If a trust has been created, it results in the vesting of property rights in the cestuis with regard to the subject-matter. If these property rights were absolute and unconditional, they cannot be taken from their owners without action on the part of such owners, by way of surrender or conveyance. The creator of those property rights, whether for a consideration or voluntarily, cannot resume his former position as owner merely because of a change of mind or a feeling that he has unwisely given or conveyed for a consideration.

"The inability of the settlor of a voluntary trust

of realty or personalty to revoke, cancel, or modify the trust and resume his former position, where he has not reserved to himself such power in the trust instrument or act of creation, is a principle of law often asserted in the cases; and a fortiori the same result should follow where the settlor received value for his trust declaration or conveyance.''

For an interesting discussion of the right of a settlor to revoke or procure cancellation of a voluntary trust, see ALR annotations following: *Fidelity & Columbia Trust Co. v. Gwynn*, 206 Ky 923, 268 SW 537, 38 ALR 937, 941; *Garneau v. Garneau*, 63 RI 416, 9 A2d 15, 131 ALR 450, 457.

■ Nowhere in the record before us do we find anything which inclines us to believe that the plaintiffs in any way relinquished their rights under this trust agreement. Nowhere do we find any testimony or evidence that Nettie Stipe attempted to surrender the benefits of the trust to Arthur Stipe, if in fact she had any right to do so, and, of course, the declaration itself is silent on the subject of revocation. We are therefore of the opinion that the trust created by Arthur Stipe in 1934 was not terminated or revoked, either with the consent of the cestui que trust or for any other cause, and therefore continued in force and effect until the date of his death.

Our conclusions respecting the subsistence of the trust declaration disposes of 105 shares of the Company's stock in controversy, by our holding that it constitutes the corpus of the trust estate as originally constituted. Thus we are left to discover the ownership of the balance of the stock in issue, aggregating 674.94 shares, and all paid as stock dividends (optional and nonoptional) on the original 105 shares, during the period from June 29, 1934 (the date of the

beginning of the trust), to November 22, 1953 (the date of Arthur's death and the termination of the trust and Arthur's life estate in the income).

The Company records disclose the following history in summary of actions with reference to dividends declared during years subsequent to the execution of the trust agreement (June 29, 1934):

| 1934 and 1935 | Cash dividends. |
|---|---|
| 1936 | (1) Dividends payable in notes at the rate of $6.00 per share, and <br> (2) Optional stock or cash dividend at rate of $9.00 per share. |
| 1937 | (1) Dividend payable in notes at rate of $6.00 per share, and <br> (2) Optional stock or cash dividend at rate of $9.00 per share. |
| 1938 | No dividend. |
| 1939 to 1944, inc. | Cash dividends. |
| 1945 | Stock dividends (not optional) payable at rate of 1 2/3 shares for every share outstanding. |
| 1946 | Stock dividends (not optional) payable at rate of one share for each two outstanding. |
| 1947 to 1951, inc. | Cash dividends or dividends payable in kind (i.e., with shares of stock in other corporations). |
| 1952 | Stock dividend (not optional) payable at rate of one share for every three outstanding. |

It will be observed from the foregoing tabulation that five different kinds of dividends have been distributed by the Company since the date of the trust agreement: (1) dividends payable in cash; (2) dividends payable in notes; (3) dividends payable in kind, i.e., in stock of other corporations; (4) dividends payable in stock on an optional basis; and (5) dividends payable in stock on a nonoptional basis. As we shall later discover, the distinction between items (4) and (5) as to the dividends paid on an "optional" or "nonoptional" basis becomes one of real importance in arriving at our final conclusion.

No issue arises between the parties as to Arthur's right as life tenant of the trust to the first three classes of dividends. But, as to the last two classes numbered (4) and (5) above, each group of adversaries claim to be entitled to all the shares so issued as dividends, i.e., as computed by them, to all of 674.94 shares (which is the total of 779.94 shares in controversy less the original trust res of 105 shares).

We conclude, for the reasons which follow, that plaintiffs are entitled to receive only 560 shares of the stock and the Bank, as Arthur Stipe's executor, the balance of the stock dividends in the amount of 219.94 shares.

The conflicting contentions of the parties project this question: Do stock dividends under the trust declaration of June 29, 1934, accrue as *income* for the benefit of the life tenant (here the late Arthur Stipe) or as *principal,* thus expanding the value of the trust corpus and the beneficial interests of the remaindermen (the plaintiffs herein).

The appealing defendants argue that by the express terms of the trust declaration Arthur reserved unto himself during his lifetime "any and all dividends

that may accrue or be declared upon the same, and that said beneficiaries shall have no right to receive any dividends from the earnings of said stock during the life of the said Arthur Stipe." They claim, therefore, that the stock dividends of 1945, 1946 and 1952 were distributions of income, earnings and profits to which Arthur had a right by the express provisions of the declaration. Plaintiffs answer this with the contention that the word "dividend", as employed in the trust declaration of June 29, 1934, means nothing more than "income", and that a "stock dividend" does not constitute income. See 33 Am Jur 904, Life Estates, Remainders, Etc. § 378, where it is said:

"* * * the courts have uniformly come to the conclusion that 'dividends,' 'profits,' 'earnings,' and all similar words and phrases, *are not sufficient,* in the absence of more explicit directions, to indicate any intention that is not equally well expressed by the single word 'income.'" (Emphasis ours.)

See also: *Gibbons v. Mahon,* 136 US 549, 568, 34 L ed 525, 10 S Ct 1057; *Lauman v. Foster,* 157 Iowa 275, 135 NW 14, 16; *Hayes v. St. Louis Union Trust Co.,* 317 Mo 1028, 298 SW 91, 98, 56 ALR 1276; *Selleck v. Hawley,* 331 Mo 1038, 56 SW2d 387, 394; *In re Heaton,* 89 Vt 550, 96 A 21, 30 LRA 1916D 201.

■ Upon the authority of the foregoing cases we are satisfied that the phrase of the trust declaration upon which the appellants rely to vest title in Arthur to all stock dividends whether or not they were optional or nonoptional, has no force nor effect for that purpose. Had the donor of the trust estate desired to achieve that result, it was incumbent upon him, by explicit directions, to indicate his intention and desire to retain all stock dividends.

The problem of determining the right to stock dividends has been frequently litigated, and the courts have not always been in accord. Three principal rules, each expressing a different approach to the problem, have been advanced in times past. They are commonly known as the Massachusetts Rule, the Pennsylvania Rule, and the Kentucky Rule.

These rules became a source of endless confusion. For this reason many states have enacted the Uniform Principal and Income Act, a constructive attempt to resolve the conflicts presented by their varying conclusions. Oregon adopted a modified version of the Uniform Act in 1931 (1931 Chap 371, Oregon Laws). It is now codified as Chapter 129 (ORS 129.010 to 129.140, incl.). As stated in ORS 129.020, one of the avowed objectives of this legislation was to *"govern the ascertainment of income and principal, * * * between tenants and remaindermen,* in all cases where a principal has been established with or, * * * without the interposition of a trust; provided, however, that the creator of the principal, or any person thereto legally empowered, may make any provision he desires touching matters covered by this chapter and *may himself direct the manner of ascertainment of income, principal* or expenses or grant discretion to the trustee or other persons so to do, and such provision and discretion, where not otherwise contrary to law, shall control, notwithstanding this chapter." (Emphasis ours.)

Thus, we find the Uniform Principal and Income Act made applicable to the precise situation we have here. The creator of the instant trust did not include a provision directing the manner of ascertaining the principal and income in any way at odds with the provisions of the Uniform Act, as he had a right to do if

he so desired. Having failed in that respect, the definitions of principal and income found in the act must prevail—that is, dividends of a kind treated by the act as principal must be accounted for as principal and dividends of a kind declared by the act as income must be treated as income (ORS 129.050, supra).

■ Generally speaking, stock dividends are treated as principal accretions rather than as income. Such is also the clear purport of ORS 129.050(1) except when a trustee has the option of receiving a dividend either in cash or in shares of stock in the declaring corporation. Such a right of choice gives to such a stock dividend the character of an "optional stock dividend" and when received is considered as a cash dividend and treated in law as income, irrespective of the choice made by the trustee.

■ In treating stock dividends as principal the Uniform Act (ORS 129.050 (1)) follows what is generally accepted accounting and tax practice and is consonant with reason. A stock dividend takes nothing from the property of the corporation and adds nothing to the interests of the shareholders. The property of the corporation is not diminished. The stockholders' interests are not increased. Their proportional interests remain the same. The only change is in the evidence which represents a given stockholder's interest, that is, the new shares representing the same proportional interest that the original shares represented before the issue of the stock dividend. In short, the corporation is no poorer and the stockholder is no richer than they were before. A stock dividend is, therefore, not in any true sense a dividend at all. Its issuance is, in the last analysis nothing more than an incident or process in corporation bookkeeping. Such is the holding of *Eisner v. Macomber,* 252 US 189, 202, 64 Fed 521,

40 S Ct 189; *Hayes v. St. Louis Union Trust Co.*, 317 Mo 1028, 298 SW 91, 98; *Rutherforl Nat. Bank v. Black*, (1943) 133 NJ Eq 306, 32 A2d 86, 89; *Millar v. Mountcastle* (1954) 161 Ohio St 409, 119 NE2d 626, 633; *City Bank Farmers Trust Co. v. Ernst* (1934) 263 NY 342, 189 NE 241, 242; *First Nat. Bank of Tuskaloosa v. Hill* (1941) 241 Ala 606, 4 S2d 170, 175.

The conclusions there reached are written into ORS 129.050(1) of the Uniform Principal and Income Act in so far as it declares that a stock dividend "shall be deemed principal".

ORS 129.050(1) which controls our decision in this matter reads as follows:

"All dividends on shares of a corporation which form a part of the principal and are payable in the shares of the corporation shall be deemed principal. Subject to the provisions of this section, all dividends payable otherwise than in the shares of the corporation itself, including ordinary and extraordinary dividends, and dividends payable in shares or other securities or obligations of corporations other than the declaring corporation, shall be deemed income. Where the trustee has the option of receiving a dividend either in cash, or in the shares of the declaring corporation, it shall be considered as a cash dividend and deemed income, irrespective of the choice made by the trustee."

ORS 129.050(1) is substantially similar to section 5(1) of the Uniform Act, but travels further than the cases last cited as to the character of stock dividends generally. Under the last part of that section a different determination is made when the stock dividend is made an "optional" offering by the corporation, that is when the shareholder is given a choice between accepting a stock dividend or accepting cash. When the corporation's declaration tenders a dividend in such optional form, the dividend received by the trus-

tee "is deemed income irrespective of the choice made by the trustee."

▮ In view of the foregoing we are bound to hold that in the absence of explicit terms to the contrary in the trust instrument, the Uniform Principal and Income Act applies with the result that all stock dividends declared by the Company on the original res of 105 shares and not tendered on an optional basis, that is, with a choice between stock or cash, are principal and should be added to and become a part of the trust res.

Referring again to the above summary tabulation of dividends declared by the Company during the existence of the trust, we find that in the years 1945, 1946 and 1952 the Company declared stock dividends without cash or other options. These, therefore, are "principal" and became a part of the trust corpus with the following results:

| | | |
|---|---|---|
| *1934* | Original trust res | 105 shares |
| *1945* | Stock dividend of 1 2/3 shares for each share held (then 105 shares) | 175 shares |
| | After 1945 dividend | 280 shares |
| *1946* | Stock dividend of 1 share for every 2 shares held (then 280 shares) | 140 shares |
| | After 1946 dividend | 420 shares |
| *1952* | Stock dividend of 1 share for every 3 shares held (then 420 shares) | 140 shares |
| | Total number of shares held in trust | 560 shares |

The foregoing determination concerning the disposition of 560 shares leaves for our further con-

sideration the question of title to the remaining stock dividend shares, being 219.94 in number. It will be recalled that in both of those years the corporation issued two dividends, or rather two different types of dividends. The first, as shown in the earlier chronological tabulation, was a dividend payable in notes, the second, or additional dividend, was an "optional stock or cash" dividend. No issue is presented by the dividends of those years payable in notes. Here we are concerned only with the "optional stock or cash" dividends declared in 1936 and 1937, and which were ultimately evidenced in the stock dividends, title to which is now in issue. Unless successfully challenged by plaintiffs, the aggregate dividend shares for the years 1936 and 1937, under the rule laid down by the last sentence of ORS 129.050(1) as to the transmutation of an optional stock dividend from principal to income, is concurred in by the plaintiffs-respondents, who in their brief say: "The effect of this provision [ORS 129.050(1), supra] is that if there was a *true option* on the part of the stockholders to receive cash or stock, then plaintiffs as remaindermen would not be entitled to 779.94 shares but would only be entitled to 560 shares." (Emphasis ours.)

But, say the plaintiffs, as their sole reason in opposition, there were no "true options", because in each of those years previous to the declaration of the dividends for 1936 and 1937, the stockholders had indicated their intention to take stock instead of cash if an optional dividend was offered by the directors. No authorities are brought to our attention in support of this proposition.

At the outset, the plaintiffs in order to support the claim against the regularity or sufficiency of the Company's action in declaring "optional" stock divi-

dends in 1936 and 1937, must first hurdle and overcome the presumption "omnia rite acta praesumuntur", which casts upon those who would deny the regularity of corporate proceeding the burden of establishing such irregularity by clear and convincing proof. This doctrine is embodied in subsections (19) and (20) of ORS 41.360 as a part of the statute of disputable presumptions, reading: "(19) Private transactions have been fair and regular. (20) The ordinary course of business has been followed."

■■ A corporation commonly speaks through its records. *Kelly v. Galloway,* 156 Or 301, 330, 66 P2d 272, 68 P2d 474. The minutes of the meetings of a corporation's board of directors are a part of such corporate records (*Teiser v. Swirsky,* 137 Or 595, 604, 2 P2d 920, 4 P2d 322), and are prima facie evidence of the facts stated. 32 CJS 687, Evidence § 767. Also see *First Nat. Bank v. Frazer* (1933), 143 Or 662, 19 P2d 1091, 22 P2d 325.

■ Unless otherwise provided by statute, the corporate charter, or other governing instrument, the authority to declare dividends is in the board of directors, and not in the stockholders or the corporate officers. 18 CJS 1104, Corporation § 474. Under the Oregon statute prevailing in the years 1936 and 1937 (OC 1930 § 25-213) the powers vested in a corporation are exercised by the directors, including the right to declare dividends, *Baillie v. Columbia Gold Mining Company,* 86 Or 1, 16, 166 P 965, and not by the stockholders. *Harvey et al. v. Campbell et al.,* 107 Or 373, 437, 209 P 107, 214 P 348.

■■ The question whether a dividend shall be declared is ordinarily one of internal management with which courts will not interfere. *Ostlind v. Ostlind Valve Company, Inc.,* 178 Or 161, 165 P2d 779; *Baillie v.*

*Columbia Gold Mining Company,* supra. The same rule applies as to the kind of dividends declared if it does not offend the law or the provisions of the corporate charter or by-laws. See Annotations, 55 ALR, pp 70-147 and cases there cited.

The plaintiffs make no claim of fraud or coersion. There is no showing that the charter or by-laws of the Company reserved to the stockholders any rights with respect to the declaration of dividends or kind of dividends to be distributed. No irregularity in the directors' action is alleged, no consideration for the elections to take stock is asserted, nor is there any showing that the directors acted solely in reliance upon the stockholders previously given assurances that they would take their dividends in stock instead of cash or that the directors would have done otherwise in the absence of the stockholders' declarations respecting their choice.

The statements of the stockholders as to what they preferred and what they intended to do if given a dividend choice was wholly gratuitous advice and an unnecessary assurance to the directors that whatever they did would be well received by the stockholders. This, no doubt, the directors were glad to have but, so far as here revealed, it was not the controlling cause for the exercise of their judgment in the manner reflected by the language of the resolutions declaring the "optional stock or cash" dividends of 1936 and 1937.

John T. Flynn, a certified public accountant and an attorney, who had been employed as an auditor of the Bend Furniture Company books since 1944, was called as a witness in plaintiffs' behalf. He was familiar with and in possession of its essential corporate records at time of trial. We deem his testimony as particularly pertinent. When asked by plaintiffs' counsel if the

1936 dividend was "a *true option* of the stockholders according to the books and records of the corporation", he made an affirmative reply. He later testified that the corporate minutes concerning the 1937 dividend were substantially the same.

■ Mr. Flynn also informed the court that the reason for the Company's action in declaring an optional "cash or stock" dividend was a tax advantage accruing to the corporation under the 1936 Internal Revenue Code thereby permitting it to take a surtax credit. This was a legitimate demonstration of good management and warranted the "optional" dividends no matter what may have been the stockholders' desire in the premises.

We have examined the minutes of the directors' meetings in 1936 and 1937 wherein are recorded the resolutions of those years directing distribution of the "optional" dividends here assailed. These corporate records on their face appear regular in every respect. We conclude that the waiver of right to elect to take cash given before the resolutions of distribution granting an optional right to take cash or stock, cannot be successfully employed here to discredit the regularity or effectiveness of the declared "optional" dividend in controversy.

No one, we are sure, would have the temerity to contend that under the circumstances any stockholder could have successfully complained if the directors had refused to declare an optional "stock or cash" dividend in the year 1936 or 1937 or that the directors could have refused to pay cash dividends after their dividend declarations if any stockholder had reconsidered his choice and demanded cash instead of stock.

■ We, therefore, find that the stock dividends aggregating 114.94 shares taken by Arthur in 1936 and

1937 were regularly distributed and having been offered by the Company with a right of election, constituted "income" to which he was entitled and not "principal" as claimed by the plaintiffs.

■ We turn to appellants' last assignment of error, which represents that the trial court erred in not finding that the trust agreement was void because it was an attempted testamentary disposition but not executed in the manner and form required by the statute on wills.

Neither upon oral argument nor in their brief do the appellants make any serious attempt to sustain that proposition. That it is palpably tenuous in reason and manifestly wanting in merit, is convincingly revealed by an examination of the instrument itself (spread in toto at the forepart of this opinion). We, therefore, give no more attention to this assignment than it received from those who fathered that strained idea and then virtually abandoned it.

■ We note that the plaintiffs' complaint makes no specific request for a decree as to dividends, if any, accruing since their father's death. Mr. Flynn, the accountant, testified that, as of the date of the trial, there were none. If, however, any have been declared since then we believe that the court should retain jurisdiction for the purpose of making such determination and include in its decree a judgment in favor of plaintiffs for such dividends, if any, as the Company may have declared on the 560 shares owned by them. *Fouchek v. Janicek,* 190 Or 251, 275, 225 P2d 783.

The decree of the lower court will be modified as hereinabove directed and the cause remanded for the purpose of determining what, if any, dividends have been distributed by the Company since Arthur's death.

Parties to pay their own costs.